Andrew **AHERN**, Jr., Rita M. Ahern, on their own behalf and as parents and next friend of Alicia Ahern, a minor, Plaintiff,

v.

William B. **KEENE**, State Superintendent of Public Instruction, the State Board of Education, Dr. Frank J. Furgele, as Superintendent of the Brandywine School District, the Brandywine School Board, and the Brandywine School District, Defendants.

Civ. A. No. 82–309 MMS.

United States District Court, D. Delaware.

Aug. 31, 1984.

Andrew G. Ahern, Jr., Wilmington, Del., and Rita M. Ahern, plaintiffs pro se.

Clark W. Furlow, Katzenstein & Furlow, Wilmington, Del., for local defendants.

Richard D. Kirk, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for state defendants.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This pro se action is brought under the Education for All Handicapped Children Act ("EAHCA" or "the Act"), 20 U.S.C. §§ 1401–1461 (1982). Plaintiffs,[1] Andrew G. and Rita M. Ahern on their own behalf and as parents and next friends of Alicia Ahern, their child, contend that the Brandywine School District (the "School District") cannot provide the free appropriate public education guaranteed by the EAHCA.[2] The Aherns seek funding for tuition and related expenses, for the 1981 academic year to the present, for Alicia's attendance at the Benedictine School for Exceptional Children ("Benedictine"), a private boarding school located in Ridgely, Maryland.

The present lawsuit culminates a five year dispute between plaintiffs and school

---

1. Although plaintiffs are proceeding pro se, Mr. Ahern is a member of the Pennsylvania Bar.

2. The defendants in this action are Dr. William B. Keene, Superintendent of Public Instruction of the State of Delaware; the State Board of Education; Dr. Frank Furgele, Superintendent of the School District; the Brandywine School District; and the Brandywine School Board.

officials over the appropriate placement for Alicia.[3] Although the issue is whether in 1981[4] Alicia was entitled to residential placement, a brief description of events prior to 1981 is necessary to place the instant action in context.

In 1979 the Aherns became dissatisfied with the program offered at the Charles W. Bush School ("Bush") for handicapped children. Concern about problems with Alicia's emotional and social development led the Aherns to apply for a state-funded private school placement. The Aherns contended that Alicia's mental handicap required a 24-hour residential program. The Individual Placement Review and Dismissal Committee ("IPRD") for the New Castle County School District ("NCCSD") considered plaintiffs' request in July 1979. Although members of the IPRD believed that Bush was an appropriate educational placement for Alicia, they agreed to wait for a psychiatric examination before rendering a final decision. An evaluation by Dr. Henry Berger, a psychiatrist affiliated with the Delaware Guidance Services For Youth and Children, recommended residential placement. The Coordinator of Clinical Services for Delaware Guidance, Nancy A. Myers, and Dr. J. Jordan Storlazzi, Alicia's personal physician, concurred with Dr. Berger's recommendation. Nonetheless, in August 1979, the IPRD denied the Aherns' request for tuition assistance. Pursuant to the review procedures prescribed by the EAHCA, the Aherns requested an "impartial due process hearing." 20 U.S.C. § 1415(b)(2). The hearing officer determined that Alicia did not qualify for financial aid and concluded that the School District had met its burden of proving that it could provide Alicia with an appropriate education at Bush. The local hearing officer's decision was upheld by the state level review officer on January 7, 1980.

Before the first round of administrative review was complete, Alicia entered Benedictine at her parents' own expense in September 1979. Pursuing their quest for state-funding, the Aherns again applied for private placement tuition for the 1980–81 school year. The IPRD Committee, the due process hearing officer and state level review officer all concluded that Alicia did not need residential placement.

On January 23, 1981, the Aherns submitted their third request for a private placement grant.[5] The Area IPRD Committee denied plaintiffs' request on April 20, 1981. A District IPRD meeting was held on April 28, 1981, but was recessed to gather more information. After reconvening on June 4, 1981, the District IPRD denied plaintiffs' request. At the October 26, 1981, due process hearing, plaintiffs introduced numerous documents, expert testimony, and testimony from Mrs. Ahern, in support of their claim that Alicia required residential placement. The School District introduced various documents as well as testimony from staff members of the Bush School and from a psychiatrist for the School District. Based on the evidence submitted, the hearing officer concluded that the Bush School satisfied Alicia's current educational plan and that Alicia did not meet the requirements for a state-supported tuition grant. The November 30, 1981, due process decision was upheld by the state level review officer.

The Aherns subsequently filed this action pursuant to 29 U.S.C. § 1415(e) to obtain judicial review of the state decision. Subsection 1415(e)(2) provides that "the court shall receive the records of adminis-

---

3. Plaintiffs previously applied for private placement tuition for the 1979–80 and 1980–81 school years. Plaintiffs have not requested reimbursement for those academic years.

4. Plaintiffs' amended complaint seeks relief for the 1981 academic year to the present, but the record is devoted entirely to Alicia's needs up until 1981 and the Court has no basis to reach a different result with respect to later years.

5. The Aherns' request for private residential placement was made to the NCCSD. After the NCCSD was dissolved on June 30, 1981, the Brandywine School District assumed responsibility for the Aherns' due process hearing. The former NCCSD and the Brandywine School District will be referred to as "the School District."

trative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Both parties requested the opportunity to provide additional evidence, and a hearing was held on April 14, 1984. Although the parties filed cross-motions for summary judgment, they agree that the case should be decided on the present record as if a trial had been held. (Doc. 44, pp. 2–7). The following findings of fact are based .on the testimony and documents presented at the 1981 due process hearing, supplemented by additional exhibits and depositions previously filed.

## I. *Background*

Alicia Ahern, born on December 28, 1964, is mentally handicapped and diagnosed as having Down's Syndrome, congenital heart abnormalties, a slight hearing loss in one ear, and problems with speech and visual acuity. Alicia has an I.Q. level of 44, which places her in the upper segment of the trainable mentally handicapped category.

In 1969 Alicia entered the Bush School and remained there until the end of the 1978–79 academic year. School officials testified at the due process hearing that Alicia's experience at Bush was marked by successful educational progress. An April 20, 1978, evaluation by Dr. Barbara Coleman, a psychologist for the School District, reported that Alicia's scores on the Wide Range Achievement Test "reflect educational skills highly commensurate with mental ability; i.e., Alicia is apparently achieving up to her presently estimated mental capabilities." (Doc. 1, p. 2).[6] Alicia was able to read and spell words at approximately a 2.5 grade level, while her math skills were at first grade level. Based on Alicia's low I.Q., Dr. Coleman interpreted the achievement test scores to indicate that Alicia was "putting forth a good effort in the classroom. She's taking advantage of

what is being offered to her in the classroom." Transcript of October 26, 1981, Due Process Hearing at 20 (Dkt. 33) (hereinafter "Tr. at ____"). Alicia's social self-help skills were at a 9 year old level and represented a "definite strength" in her overall learning experience. (Doc. 1, p. 2). Alicia could care for herself at the table, write occasional short letters, make telephone calls and do remunerative work. (*Id.*). She had not, however, developed to the point where she could be left alone to care for herself. (*Id.*). Overall Alicia's skills placed her in the upper half of the population at Bush.

Although the Aherns were satisfied with Alicia's academic progress and achievement at Bush, they became increasingly concerned about her emotional stability and social development. Beginning in 1975, the family noticed that Alicia talked to herself. As she approached adolescence Alicia's behavior at home and in the neighborhood apparently deteriorated. In addition to talking loudly to herself and to imaginary friends, Alicia withdrew into a fantasy world when moderately stressed, wandered away from home, talked to strangers, occasionally related in a bizarre and inappropriate manner, and twirled herself around in circles on sidewalks near her home and at shopping malls. In the spring of 1979, these episodes led the Aherns to Delaware Guidance Services For Children And Youth, Inc. ("Delaware Guidance").

Dr. Henry G. Berger, a psychiatrist affiliated with Delaware Guidance, first examined Alicia in July, 1979, and reported to the IPRD that Alicia exhibited no signs of severe depression or psychosis. He stated, however, that Alicia used "borderline psychotic defenses of withdrawal into fantasy" in order to "deal with the stress of adolescence." (Doc. 6, p. 1–2). Explaining that Alicia's problems could be traced to her home environment, which had only a "limited capacity" to "engage Alicia emotionally," Dr. Berger believed that Alicia needed

---

**6.** Documents filed as part of the evidentiary record in this case (Dkt. 40) will be cited as "Doc. ____, p. ____."

more peer interaction and stimulation after the school day ended. (*Id.*). According to Dr. Berger, a residential program geared to meeting Alicia's emotional and vocational needs was "imperative." (*Id.*). At the due process hearing, Dr. Berger elaborated on his recommendation, explaining that residential placement was necessary because Alicia had a tenuous grasp on reality and needed a constant, safe, supportive environment "in order to learn to cope ... with the world around her in a more successful and competent manner." (Tr. at 33).

School officials were cognizant of the emotional difficulties described by Dr. Berger. Dr. Coleman in her 1978 report observed that Alicia was "highly distractible and inattentive." (Doc. 1, p. 1). Similarly, the principal of Bush, Linda O. Mazepink, wrote in a May 29, 1979, letter to Nancy A. Myers, Coordinator of Clinic Services for Delaware Guidance, that Alicia's academic progress indeed was "hindered by anxiety and a lack of confidence. Her day-dreaming and fantasizing are also deterrents to her learning. Alicia, in many cases, does not seek challenges and has a short attention span." (Doc. 3, p. 1). Mrs. Mazepink, however, qualified her observations by explaining that Alicia's learning difficulties had been discussed with Mrs. Ahern during numerous conferences and were being addressed in Alicia's individualized educational program ("IEP"). "If this were not the case," Mrs. Mazepink explained, "we too would be concerned about our ability to meet her educational needs." (*Id.*).

One of Alicia's teachers at Bush, Claire Dunigan, corroborated Mrs. Mazepink's evaluation. Mrs. Dunigan testified that Alicia's fantasizing presented occasional problems, usually in the hallways and at lunch, but that at most times was under control. (Tr. at 54–55). Alicia's emotional problems, explained Dunigan, "really didn't present a problem in the classroom" and did not interfere with her learning. (*Id.* at 55). In fact, during the time Alicia presented the most difficulty for her parents at home, Alicia was described by Mrs. Dunigan as motivated, anxious to learn and very cooperative with her teachers. (*Id.*).

School officials testified that Alicia's particular social and emotional problems were not uncommon among students at Bush. (Tr. at 46, 53). Specific programming, not previously available in 1978–79, has been developed to meet those needs. (Tr. at 21–27; 46; 49; 51–53).

As previously noted, despite numerous conferences with school personnel, the Aherns in September, 1979, enrolled Alicia in a residential program at Benedictine. Recent achievement scores reveal some progress in reading, mathematics, and language skills. Alicia's social and emotional skills, however, have improved significantly. Follow-up reports indicate that the structured program at Benedictine has helped Alicia to express herself in a more mature manner and has reduced her inappropriate behavior. (Docs. 48, 53). An October 19, 1981, follow-up evaluation prepared by Dr. Berger one week before the most recent due process hearing memorializes that

Alicia has matured both socially and in her ability to handle anxiety, as evidenced both by her behavior at home, reported by her parents as well as by her behavior during the interview. She appears significantly less dependent; she seems able to use more appropriate defense mechanisms, such as denial and repression, suggesting a strengthening of her ego functioning. I feel these gains are in response to efforts made at the Benedictine School, and that there is still evidence, however, that without continued input, a structured, active, appropriate setting, she is capable of regressing and falling back from current gains. I therefore recommend continued placement at the Benedictine School.

(Doc. 53). In addition, Dr. Berger testified that Alicia showed marked changes and improvement, suggesting "better judgment, better competence and increased ability to handle difficulties ... in a more realistic and appropriate manner." (Tr. at 34). Mrs. Myers, Dr. Storlazzi and Dr. Kliman all agreed with Dr. Berger that

Alicia needs continued structure and support and should not be removed from Benedictine.

## II. *The Administrative Decisions*

The due process hearing officer and state level review officer denied plaintiffs' request for a tuition grant for the 1981–82 year. The hearing officer concluded that the School District demonstrated that Bush was an appropriate educational placement for Alicia. (Doc. 55). Although the Hearing Officer acknowledged Alicia's improved emotional condition and social orientation, he found that the parents' decision to withdraw Alicia from the Bush School in 1979 was not warranted. Recognizing Alicia's need both for a "structured program" and "peer interaction," the hearing officer concluded:

> Public school officials have testified that the provisions of the child's current IEP can be and, in fact, are a part of the educational programming at the public school. In light of the above, as well as documented evidence of the child's self-awareness, independence, and academic ability, we must conclude that the child can benefit from an appropriate education within the confines of Delaware's "continuum of services."

(Doc. 55, p. 4).

In her decision upholding the hearing officer, the state level review officer also found that Alicia did not qualify for state-funded private placement as a "complex or rare" handicapped person:

> Alicia has undisputedly made excellent progress at the Benedictine School. Her emotional problems are less evident, her behavior is more appropriate and she is able to function better. However, it has not been shown that it is the residential component that has made the difference for her. From the schedule submitted by the school, it appears that the residential component provides largely socialization and recreational activities and is not designed to carry out specific objectives of Alicia's educational program. Counseling, peer interaction, speech and language skills, self-help skills and academic

> objectives can all be implemented by the Bush School within its program. . . .

> \* \* \* \* \* \*

> . . . Although Alicia has multiple handicaps, her primary handicapping condition is Downs Syndrome. Her emotional problems, which were severe in the past, do not currently appear severe enough to constitute a second handicapping condition. Nor is the overall impact of her handicap so severe as to prohibit her benefiting from an appropriate public education. The documentation does not support the label "complex or rare". Additionally, the Brandywine School District has shown its willingness and ability to provide an appropriate program at the Bush School.

(Doc. 56, p. 6).

## III. *Judicial Review Under EAHCA*

The EAHCA permits "[a]ny party aggrieved by the findings and decision" of state administrative hearings to bring a civil action in district court. 20 U.S.C. § 1415(e)(2). The Act specifies that the court shall receive the administrative record, hear any proffered additional evidence and, "basing its decision on the preponderance of the evidence," grant appropriate relief. *Id.* Although the Third Circuit Court of Appeals has held that section 1415(e)(2) "contemplates a de novo review role by the district courts," *Kruelle v. New Castle County School District*, 642 F.2d 687, 692 (3d Cir.1981), the Supreme Court in *Hendrick Hudson Central District Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), reviewed the policies and objectives of the Act and interpreted the standard of review somewhat more narrowly. "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence,'" the Supreme Court explained, is not an "invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 206, 102 S.Ct. at 3051. Although reviewing courts must make an independent review of the evidence to de-

termine whether the state has offered an appropriate education, *See Irving Independent School District v. Tatro,* —— U.S. ——, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984), "due weight" must be given to state administrative decisions. *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051. A reviewing court's inquiry is twofold: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* at 206–07, 102 S.Ct. at 3051. Once a court determines that the requirements of a free appropriate education have been met, "questions of methodology are for resolution by the States." *Id.* at 208, 102 S.Ct. at 3052. *See also Milliken v. Bradley,* 418 U.S. 717, 741–42, 94 S.Ct. 3112, 3125–26, 41 L.Ed.2d 1069 (1974) (decisions of educational policy and control traditionally have been vested in state and local authorities).

The Aherns challenge the decision denying tuition funding for residential placement. Although plaintiffs allege numerous violations of procedural due process, the Aherns' basic position is that a free appropriate education cannot meet Alicia's unique needs without a 24-hour residential program.[7] Alicia's emotional problems, her parents argue, cannot successfully be treated unless she is in a highly structured program which offers significant activities after the school day formally ends.

Defendants contend that Alicia's emotional difficulties did not interfere with her ability to benefit from the education offered by the School District and any current problems can be treated through a variety of programs available at the Bush school. In the alternative, defendants argue that the Aherns' unilateral decision to change Alicia's educational placement in

1979 bars them from now seeking tuition reimbursement.

After carefully reviewing the voluminous record submitted by the parties, the Court concludes that the School District can provide a free appropriate public education within the programs offered at the Bush School.

### A. *Procedural Defects in the State Administrative Process*

Plaintiffs do not quarrel with the procedures used to develop Alicia's individualized education program. Instead, their "due process" claims center on various alleged defects in the administrative review process. *See* Dkt. 43, ¶¶ 19, 22, 28–35 (Amended Complaint). It is not clear to the Court what relief plaintiffs seek for these alleged violations; however, after considering each allegation I conclude that plaintiffs' due process rights were not violated.

### 1. *Delays*

On January 23, 1981, the School District received the Aherns' 1981–82 request for tuition funding. A due process hearing was not held until October 26, 1981. Plaintiffs contend that two periods of delay violated procedural due process.

Plaintiffs first complain that the Area IPRD committee meeting should have been scheduled sooner. The record reveals, however, that the IPRD promptly began working on plaintiffs' January 23, 1981, request. Nick A. Cofrancesco, chairman of the Area I IPRD Committee, responded on February 18, 1981, and indicated that he planned to make a classroom observation of Alicia at Benedictine on February 24th, collect records and other data and schedule a committee meeting to consider the re-

---

**7.** Plaintiffs' complaint also asserts a claim that the standard set out in 14 Delaware Code section 3124(a), the congruent state statute authorizing funds for private residential placement, is more restrictive than the federal standard and therefore violates the equal protection and due

process clauses of the United States Constitution. At oral argument, however, plaintiffs dropped this claim. *See* Transcript of April 4, 1984, Hearing at 64 (Dkt. 44). Plaintiffs contend that, as a matter of federal law, they are

quest for tuition funding.[8] (Doc. 36). On April 8, 1981, the Area IPRD scheduled an April 20 conference to determine an appropriate educational placement for Alicia. On April 28, 1981, a District IPRD conference convened, recessed for additional information, and issued its final decision on June 4, 1981. I find no evidence that the School District was acting in bad faith. To the contrary, given the context of plaintiffs' request it appears that the IPRD committee's scheduling was reasonable.

The Aherns' second complaint focuses on delays in scheduling the due process hearing. Plaintiffs' request for a due process hearing was sent on July 6, 1981, but was not scheduled until October 26, 1981. (Doc. 44). Federal and state regulations both provide that a final decision by the hearing officer must be rendered within 45 days after receiving a request for a hearing. 34 C.F.R. § 300.512; *Administrative Manual For Programs For Exceptional Children* 15 (September 1980) ("*Administrative Manual*"). The regulations also provide that specific extensions of time may be granted at the request of either party. *Id.* While in some circumstances a delay in scheduling a hearing can violate the Act, the record in this case indicates that any delay was not caused by defendants. Because the available hearing officers for the School District previously had presided over the Aherns' 1979–80 and 1980–81 requests, plaintiffs and the School District agreed to locate a different hearing officer. (Tr. at 9–11, 96; Doc. 45). Recognizing that it would take several weeks to obtain a comprehensive list of state approved qualified hearing officers, the School District and the Aherns agreed to waive the 45-day limit. (Docs. 45, 46). This waiver, coupled with the need to accommodate one of plaintiffs' own expert witnesses (Tr. at 96), leads me to conclude

that the October 26, 1981, hearing date did not violate plaintiffs' procedural due process rights.

### 2. *Unilateral Appointment of Hearing Officers*

Plaintiffs contend that the district superintendent's "unilateral appointment" of the due process hearing officer and state level review officer was a violation of plaintiffs' right to an impartial administrative hearing. In addition, plaintiffs argue that "educators" should not be selected to sit as hearing officers. The Court finds no merit to these arguments. The School District's appointment of the two officers was in compliance with applicable state and federal regulations. *See* 34 C.F.R. § 300.507 (1981); 14 *Del.C.* § 3124(b). Moreover, a review of the record indicates that plaintiffs received a fair and considered review of the evidence presented.

### 3. *Ex Parte Contacts*

Plaintiffs complain that, following the due process hearing, lawyers for the School District had an *ex parte* contact with the hearing officer. The record reveals that on November 17, 1981, the attorney for the School District sent a letter supplying the hearing officer with copies of requested authorities. (Doc. 54). In addition to forwarding various cases, the letter highlighted the relevance of each case, and commented on the evidence submitted at the due process hearing. Although *ex parte* communications are generally discouraged, the Court finds that plaintiffs were not prejudiced by any communication between the hearing officer and the School District. First, the School District mailed Mr. Ahern a carbon copy of the letter sent to the hearing officer. Second, Mr. Ahern made no request to respond and, as far as

---

entitled to private residential placement. *Id.* at 62.

**8.** The Aherns' 1981–82 request was filed several months before administrative review of the 1980–81 request was complete. The state level review officer's decision denying funding for 1980–81 was issued on March 17, 1981. (Dkt.

32, at A–3). Defendants' counsel suggests it was not unreasonable to conclude that the IPRD committee was awaiting the outcome of the 1980–81 decision before rendering its decision on the 1981–82 request. The record, however, does not indicate whether the delay was occasioned by the pending 1980–81 decision.

the record indicates, had ample opportunity to send a similar letter. On the basis of those facts, I cannot conclude that plaintiffs' due process rights were violated.

#### 4. *Failure to Swear Witnesses*

■ Plaintiffs contend that the hearing officer's refusal to swear witnesses was a violation of procedural due process. Federal and state regulations in 1981, however, did not require witnesses to be under oath at the due process hearing. The Court knows of no authority to support plaintiffs' allegation and, after reviewing the transcript of the due process hearing, I find that plaintiffs suffered no prejudice from the failure to swear witnesses.

#### 5. *Evidentiary Rulings*

■ Plaintiffs argue that it was improper for the state level review officer to consider the decisions from the two prior administrative proceedings. The Court finds, however, that the officer's decision admitting reports from prior hearings was not an abuse of his discretion. As long as material is shared five days before the hearing, state regulations do not limit the type of evidence that can be considered. *See Administrative Manual* 15.

#### B. *The EAHCA's Guarantee of a Free Appropriate Public Education*

The basic dispute in this case is whether Alicia qualifies for residential placement. To resolve that question, the Court must first determine the parameters of a "free appropriate education," and then consider whether the program offered by the School District was reasonably calculated to enable Alicia to receive the benefits guaranteed by the Act.

The EAHCA provides that a state receiving federal grants under the Act must have in effect "a policy that assures all handicapped children the right to a free appropriate education." 20 U.S.C. § 1412(1).[9] The "free appropriate" education is tailored to the handicapped child's educational needs by means of an "individualized education program." ("IEP"). 20 U.S.C. § 1401(18).[10] Although states have the primary responsibility for developing educational programs for handicapped children, the Act expressly defines "free appropriate public education" as "special education and related services," which have been provided at public expense, under public supervision, and which meet state standards and conform with the child's IEP. 20 U.S.C. § 1401(18). Special education means "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." 20 U.S.C. § 1401(16). Related services include

> transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identifica-

---

**9.** The Delaware legislature's provision for establishing and funding a comprehensive special education for handicapped children is contained in 14 Del.C. §§ 3101–3126.

**10.** The IEP is prepared at a meeting attended by a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, if appropriate, the child. It consists of

> (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the

> specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(19). A child's IEP must be evaluated and reviewed at least annually. 20 U.S.C. § 1414(a)(5).

tion and assessment of handicapping conditions in children.

20 U.S.C. § 1401(17).

In *Rowley* the Supreme Court explained that a free appropriate education "consists of educational instructions specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." 458 U.S. at 188–89, 102 S.Ct. at 3041. The Act, however, does not require states to provide every special service necessary to maximize each handicapped child's potential commensurate with the opportunity provided nonhandicapped children. *Id.* at 200, 102 S.Ct. at 3047. Instead, the "basic floor of opportunity" guaranteed by the Act "consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201, 102 S.Ct. at 3048.[11]

Plaintiffs do not challenge the appropriateness of Alicia's 1981–82 IEP (Doc. 38). The program was developed at Benedictine and later adopted by the School District at IPRD committee meetings. (Docs. 42, 43). It outlines various educational and pre-vocational goals, focusing on Alicia's language, reading and math skills. The IEP also includes "counseling" and "guidance" objectives designed to improve Alicia's ability to interact with others in a responsible, mature, and appropriate manner, strengthen her self-image, increase her awareness of human sexuality, and reduce inappropri-

ate behavior such as talking to herself and hugging strangers.

Plaintiffs agree the Bush School has programs that can implement the "educational" objectives of Alicia's IEP. *See* Transcript of April 4, 1984, Hearing at 33 (Dkt. 44). Indeed, achievement scores confirm that Alicia was working up to her ability at Bush and it appears that the improved Benedictine language, math, and reading scores could have been reached had Alicia remained in public school. *See* Tr. at 55–56. The Aherns, however, contend that Alicia's guidance and counseling goals can be treated only through a residential program which provides a 24-hour structure and continuous social interaction. Although Bush does provide needed structure and peer interaction, plaintiffs contend that Bush is not an appropriate educational placement because Alicia needs more than a six and a half hour a day program. Thus, from plaintiffs' vantage point, the issue is not whether Bush is adequate for what it offers, but whether Alicia needs more continuous care in order to receive an appropriate education.

■ It is undisputed that "residential placement" in a private school is among the "related services" that states may be required to provide in order to fulfill their obligations under the EACHA. Federal regulations provide:

If placement in a public or private residential program is necessary to provide a

---

**11.** In *Rowley* the Supreme Court opined that helping handicapped children achieve a reasonable degree of self-sufficiency is not a substantive goal of the EAHCA. Because handicapping conditions affect children in different degrees, the substantive goal of the Act is to provide services which are "educationally beneficial":

The desire to provide handicapped children with an attainable degree of personal independence obviously anticipated that state educational programs would confer educational benefits upon such children. But at the same time, the goal of achieving some degree of self-sufficiency in most cases is a good deal more modest than the potential-maximizing goal adopted by the lower courts.

Despite its frequent mention, we cannot conclude, as did the dissent in the Court of

Appeals, that self-sufficiency was itself the substantive standard which Congress imposed upon the States. Because many mildly handicapped children will achieve self-sufficiency without state assistance while personal independence for the severely handicapped may be an unreachable goal, "self-sufficiency" as a substantive standard is at once an inadequate protection and an overly demanding requirement. We thus view these references in the legislative history as evidence of Congress' intention that the services provided handicapped children be educationally beneficial, whatever the nature or severity of their handicap.

458 U.S. at 201–02 n. 23, 102 S.Ct. at 3048 n. 23.

free appropriate public education to a handicapped person because of his or her handicap, the program, including non-medical care and room and board, shall be provided at no cost to the person or his or her parents or guardian.

34 C.F.R. § 104.33(3) (1981).[12] If, however, a handicapped child has available a free appropriate education and parents choose to place the child in a private program, the state is not required to fund that placement.

In *Kruelle v. New Castle County School District,* 642 F.2d 687 (1981), the Third Circuit Court of Appeals considered when a child's emotional and medical problems necessitate "residential placement" as part of the Act's guarantee of a free appropriate education. Presented with a profoundly retarded child, lacking many basic self-help skills and having a history of emotional problems which resulted in choking and self-induced vomiting when stressed, the *Kruelle* court explained that the "concept of education is necessarily broad" when evaluating the unique needs of the severely mentally handicapped. Where basic self-help and social skills are lacking, the Court said, "formal education begins at that point." *Id.* at 693, *quoting Battle v. Pennsylvania,* 629 F.2d 269, 275 (3d Cir.1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). To determine whether residential placement is required, a court must analyze "whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process." *Id.* at 693. The EACHA, the Court held, requires a case by case assessment of "the link between the supportive service or educational placement and the child's learning needs." *Id.* at 694.[13] Noting that some courts have cast doubt on the viability of distinguishing between social/emotional and educational disabilities, *see North v. District of Columbia Board of Education,* 471 F.Supp. 136, 141 (D.D.C.1979), the *Kruelle* court emphasized that the "claimed inextricability" of medical and educational grounds for certain services "does not signal court abdication from decision-making in different matters. Rather, the unseverability of such needs is the very basis for holding that the services are an essential prerequisite for learning." 642 F.2d at 694.

■ After reviewing the evidence in this case, the Court concludes that a residential program is not necessary to provide Alicia with an appropriate education. First, I find that Alicia's emotional problems are "segregable from the learning

**12.** Under Delaware's funding statute private placement funding is granted:

only to a "complex or rare" handicapped person defined as a person in the chronological age group 4 through 20 years inclusive, who is found to suffer from 2 or more of the defined handicaps, or who is so severely afflicted by a single handicap, that the total impact of the condition means that he or she cannot benefit from the regularly offered free appropriate public educational programs. The determination shall be made by a committee appointed by the local board of education for identification, placement, review and dismissal of handicapped persons and by the State Board of Education that no school district or other state agency has a suitable free and appropriate program of education for the particular person. Such private placement shall be in a school/institution approved by the State Board of Education. The State Board of Education shall make the final determination con-cerning the designation of a person eligible under this definition.

14 *Del.C.* § 3124(a).

The State Board of Education, pursuant to 14 *Del.C.* § 3101(4), lists the following designated handicaps: visual or hearing impairment; physical impairment; speech and/or language impairment; learning disability; social or emotional maladjustment; mental retardation; autistic; complex or rare; gifted or talented; and deaf/blind. Administrative Manual at 21–25. If an individual has handicapping conditions "so severe or complex that no program can be provided," she is eligible for consideration for a residential program. *Id.* at 25.

**13.** *See Battle v. Pennsylvania,* 629 F.2d at 280 (state's policy of refusing to consider or provide special educational programs for longer than 180 days is inconsistent with the Act's emphasis on developing a program individually designed to meet a child's unique needs).

process." Testimony and documentary evidence in this case confirm that Alicia's emotional problems, exhibited primarily in response to a stressful home environment,[14] were not interfering with her ability to benefit from the special education at Bush. Dr. Coleman's April 26, 1978, evaluation (Doc. 1) and a 1979 Student Progress Report (Doc. 2) support the finding that Alicia academically was achieving in the upper segment of the trainable mentally handicapped category and was making progress in the area of social development. Although during the 1978–79 academic year school officials were concerned that Alicia's academic progress was being hindered by anxiety, lack of confidence, daydreaming, and fantasizing (Doc. 3), both Mrs. Mazepink and Mrs. Dunigan testified at the due process hearing that these problems were being addressed by the school.[15] Thus, unlike the handicapped child in *Kruelle*, Alicia, in 1979, was making meaningful progress toward her educational goals, and had attained a degree of academic proficiency and self-sufficiency which placed her in the upper half of the population at Bush.

The opinions and recommendations expressed by plaintiffs' experts do not establish that Alicia needs a residential program in order for her to receive benefits. Dr. Berger explained that he had no first hand knowledge of either Benedictine or Bush, but that he recommended continued residential placement at Benedictine because, in his opinion, it would help maximize Alicia's ability to cope and relate in a more successful and competent manner. (Tr. at 33).[16] Dr. Berger did not testify that a residential program was the only means of meeting her emotional and educational needs.

I also find that the School District has met its burden of proving that it can provide Alicia with an appropriate education. The dispute in this case is not one in which the School District claims no responsibility for Alicia's emotional problems and social needs. *Cf. Christopher T. v. San Francisco Unified School District*, 553 F.Supp. 1107 (N.D.Cal.1982). IPRD's consideration and approval of her 1981–82 IEP (Doc. 43) indicates that the School District agrees that an appropriate education, tailored to Alicia's unique needs, includes pre-vocational training, guidance, and counseling.[17] Moreover, testimony at the due process hearing supports the state level review officer's finding that the Bush School has offered to and can meet the guidance and counseling components of Alicia's 1981–82 IEP. Dr. Coleman and Mrs. Mazepink both described specific programs, not available at Bush in 1979, which could meet the objectives outlined in Alicia's 1981–82 IEP. Dr. Coleman testified that Bush has a formal counseling program which includes sessions on human sexuality,[18] group discussions on attitudes toward the handicapped, and parent counseling. (Tr. at 21–22). In addition, Dr. Coleman explained that because Alicia's behavior problems were typical among students at Bush, counseling for basic social skills is "woven in the whole program." (Tr. at 25). Addressing Alicia's tendency to talk to herself and hug inappropriate people, Dr. Coleman testified that such problems can be controlled

**14.** *See, e.g.,* Doc. 6, p. 1–2; Doc. 3, p. 2; Tr. at 73.

**15.** *See* text *supra* p. 7.

**16.** Mrs. Myers, coordinator of clinic services at Delaware Guidance, testified that residential placement was "the treatment of choice." Tr. at 59.

**17.** An IEP developed by NCCSD in 1980–81 (Doc. 28) is similar to Benedictine's 1981–82

IEP. NCCSD's 1980–81 IEP has a program to improve Alicia's economic and numerical skills, map skills, reading comprehension, and spelling. It also includes a program to decrease Alicia's day-dreaming and fantasizing and improve her self-concept through counseling sessions, and to develop domestic and food service skills.

**18.** The human sexuality program at Bush is based on the same resources used at Benedictine. Tr. at 26.

through the techniques of redirection and behavior modification. (Tr. at 24).[19]

Mrs. Mazepink testified to programs that could meet Alicia's pre-vocational goals. (Tr. at 46–48). Although not available in 1978–79, Mrs. Mazepink explained that Bush has a program to train students (ages 15 to 21) in various job categories and give them job-related skills. In addition, beginning in 1980–81 Bush implemented an independent living program, which gives students an opportunity to live in a structured apartment setting twenty-four hours a day, five days a week for eight weeks. Although the Bush School day officially ends at 2:30 p.m.,[20] there is also testimony from Dr. Coleman and Mrs. Mazepink that some extracurricular programs are provided and that the school helps parents mobilize community resources for after-school activities.

The Court concludes that the School District has considered Alicia's unique needs and has met its burden of proving by a preponderance of the evidence that it has programs to implement the guidance and counseling objectives of Alicia's 1981–82 IEP.[21]

## IV. *Conclusion*

 No one can dispute that Alicia is better off because of her attendance at Benedictine: Alicia is more independent and self-aware, and exhibits few of the behavioral patterns which originally led the Aherns to seek a residential program. Although there is unrebutted evidence that Alicia's gains might be lost if her current placement is changed, I cannot on that basis conclude that residential placement is required. As the Supreme Court made clear in *Rowley,* the EAHCA does not require states to provide the best education that money can buy, nor are states required to provide education which maximizes a handicapped child's potential. Instead, states must offer a program from which the child can benefit. The School District's approach to Alicia represents a commendable effort at accommodating her unique needs. Undoubtedly, more can be done for children like Alicia. *See* Doc. 43 (Minority Report of Mary W. Lewis). However, on the basis of the record surrounding Alicia's 1981–82 placement, I find that the School District has offered a free appropriate program which can confer educational benefits on Alicia.

Judgment will be entered in favor of defendants.

---

**19.** IPRD committee meeting notes (Docs. 42, 43) reveal additional attempts to coordinate counseling and guidance services for Alicia.

**20.** *See* Administrative Manual 31.

**21.** Because the School District can provide an appropriate education through programs at Bush, the Court need not address whether the Aherns are barred from recovering tuition funds because of their actions in 1979. *Com-*

*pare Stemple v. Board of Education of Prince Georges County,* 623 F.2d 893 (4th Cir.1980), *cert. denied,* 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981) (tuition expenses cannot be recovered where parents unilaterally send child to private school during pendency of review procedures) *with Anderson v. Thompson,* 658 F.2d 1205 (7th Cir.1981) (retroactive award of tuition expenses is not barred even where parents act unilaterally).