Andrew Dewey HALL, a minor By and Through his next friend and mother, Farris L. ALLREAD, Plaintiffs,

v.

Dr. Robert FREEMAN, in his official capacity as Superintendent of the DeKalb County School Board; The DeKalb County Board of Education; Dr. Werner Rogers, in his official capacity as State School Superintendent; The State Board of Education; Dr. James Ledbetter, in his official capacity as Commissioner of the Georgia Department of Human Resources; and the Board of the Department of Human Resources, Defendants.

Civ. A. No. C86–1715A.

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 12, 1987.

Patricia M. Smith, Smyrna, Ga., for plaintiffs.

Charles L. Weatherly, Weeks & Candler, Decatur, Ga., Patrick W. McKee, William C. Joy, Office of State Atty. Gen., Atlanta, Ga., for defendants.

## ORDER

RICHARD C. FREEMAN, District Judge.

This case was tried to the court without a jury commencing December 11, 1986, and ending December 12, 1986. The complaint alleges that Andrew Dewey Hall, the son

of Farris L. Allread, was denied a free appropriate public education as required under the Education for All Handicapped Children Act, 20 U.S.C. § 1401, et seq. (hereinafter referred to as the "EHA" or "Public Law 94–142"). Plaintiff seeks a declaration under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, that Andrew Dewey Hall is entitled to the free appropriate education she deems appropriate in this case. Plaintiff also seeks reimbursement from defendants for certain private school expenses plaintiff has incurred.

## I. STATEMENT OF FACTS

Andrew Hall is a 12–year–old seriously emotionally disturbed child with a long history of medical, behavioral, emotional and family problems. From infancy, he has had medical problems including respiratory infections and febrile seizures which compounded his other problems. At an early age, he was placed on anti-convulsant medication. (Allread depo. p. 39). The seizures which afflicted Andrew have been fairly well controlled by the anti-convulsants since the time he was first administered the drug, and any seizures which have occurred subsequently were the result of fever. (Testimony of Dr. Krawiecki).

From an early age Andrew was subjected to many things in his home environment that caused undue stress in his life. During the ten years that his mother and father were married and lived together, a number of people lived with the family, including friends and relatives. (Allread depo. p. 25). When Andrew was about 33 months old, his father separated from the family and this separation continued for about a year and a half before a final divorce. (Allread depo. p. 25). During this time, Andrew's older brother was experiencing some behavior problems and his sister had to be separated from the family to live with grandparents because of problems she and her older brother were having. (Allread depo. p. 44). There were also indications of some physical and verbal abuse of Andrew at the hands of his father. (Allread depo. p. 28).

From the time that his parents were separated, there was constant instability in the family environment. They moved from place to place and members of the household were constantly changing. Members of the household included at various times a female friend and her two boys, another female friend and a young unmarried pregnant girl (and later the newborn baby), Sgt. Allread's brother, and her parents. (Allread depo. pp. 40–44). Some of Andrew's doctors began to suggest that he was having problems and was being affected rather seriously by his environment and that these problems were likely the result of the family turmoil. Administrative Record (AR) 941, 949. Even his mother observed that he was having difficulty handling the change in the schedule of his life and the pressures resulting from different individuals moving in and out of the household. (Allread depo. p. 50).

Andrew's mother remarried when he was approximately 4½ years old and the family moved into a new home with Sgt. Allread's new husband. That marriage was short lived. Sgt. Allread herself noted that she had "had the flu that lasted longer than that marriage." (Allread depo. p. 54). After the second divorce, a female friend of Andrew's mother, Terri Hatley, moved in with the family and continues to live with the family. In the spring of 1983 Andrew's mother decided to join the Army Reserves. A family friend moved into the home for a number of weeks to assist Ms. Hatley in looking after Andrew while Andrew's mother was attending basic training for the military. (Allread depo. p. 85).

Andrew was approximately 5 years old when he entered first grade in a pre-academic diagnostic program. This was in September of 1980 and he began having behavioral difficulties which were exhibited in his school environment. As a result of these difficulties, he was placed at the Carl Sandburg Learning Center in December of 1980 where he stayed until the summer of 1985. (Allread depo. p. 90).

Andrew progressed academically while at Carl Sandburg. Andrew is a bright child and his academic progress was con-

sistent with that fact. (AR 999–1000). Carl Sandburg was a non-therapeutic day treatment program for multi-handicapped children, and because of this it was able to make progress with Andrew behaviorally only in the sense that he was "contained." (AR 1003). The Sandburg staff decided that Andrew needed a more therapeutic environment where some change in his insights and psycho-dynamics could be effectuated because it was believed that this had led to his difficulties in tolerating his school environment. This decision was made in late 1984 and early 1985. (AR 1004). The Maryland educational review team (CARD) considered the Carl Sandburg recommendations and determined in early 1985 that Andrew should go into a *day* therapeutic program at the Regional Institute for Children and Adolescents (RICA) which contained a therapeutic milieu. (AR 1015). Sgt. Allread did not agree with this recommendation because it did not include a residential component.

Initially Sgt. Allread suggested the possibility of placing Andrew residentially (AR 877 and 912), but later she began demanding residential placement for Andrew and she instituted a due process hearing in an attempt to accomplish her goal. (Allread depo. p. 94). Although many tried to convince her that the day program at RICA would work for Andrew she persisted in proceeding with the due process hearing, insisting that the day program would not work for Andrew. Ultimately it was decided that Andrew could go into a program at RICA in June of 1985 that included a day therapeutic treatment program for educational reasons and a residential program for clinical reasons. (AR 1094).

Sgt. Allread has insisted that "Organic Personality Syndrome" be noted on Andrew's Individualized Educational Programs (IEPs) in the apparent belief that this diagnosis has great weight in dictating the placement of Andrew in a residential facility. This diagnosis was included on the IEP prepared before he left RICA to come to Georgia (AR 688) and on the IEP prepared by DeKalb County on March 20, 1986. (AR 614). Since Andrew's admission to RICA, Sgt. Allread has demanded residential placement for her son.

In the fall of 1985 Sgt. Allread learned that she might be transferred to Georgia. Concerned about placement for Andrew, Sgt. Allread visited Atlanta during November 1985 and met with Glenda Molton, Assistant Director of the DeKalb County School System. Ms. Molton testified at trial that she informed plaintiff that DeKalb could not place Andrew unless he was a DeKalb County resident.

Upon her arrival in Atlanta, Sgt. Allread lived in temporary quarters outside of DeKalb county. She enrolled Andrew in the Georgia Mental Health Institute (GMHI) on December 27, 1985, under a voluntary entrance. Andrew functioned well at GMHI and his mother was pleased over his progress. (DeKalb's Ex. 5, p. 88). In early February, Sgt. Allread was informed that Andrew would be discharged from the GMHI because he was doing well and his therapist at GMHI believed that he could continue to function well outside GMHI. Andrew's therapist thought that Sgt. Allread desired to bring Andrew home (DeKalb's Ex. 5, p. 88), but noted that Sgt. Allread continued to believe that he must have residential treatment. (DeKalb's Ex. 5, p. 91). Sgt. Allread had not established her residency in DeKalb County at the time Andrew was to be discharged from GMHI on March 14, 1986. As a result, GMHI offered to delay his discharge for 2 weeks. (Allread depo. p. 154). Sgt. Allread refused the offer of GMHI and by the time of his discharge she had already checked into potential private residential placements for him. (Allread depo. p. 138). She contacted Davison School, a private school for children with speech and language difficulties with a residential component.

Learning that Sgt. Allread was scheduled to close on a house on March 21, 1986, Ms. Molton scheduled an IEP meeting for March 20, 1986. The March 20 IEP meeting was attended by school system staff, a representative of GMHI, Sgt. Allread, and her attorney. (AR 614–623). The IEP Committee recommended a day program at the Wesley Chapel School (a therapeutic

treatment program with a psychotherapeutic milieu) as an appropriate educational program for Andrew. Sgt. Allread disagreed with the IEP Committee recommendation and placed Andrew in the Davison School. Davison School is primarily for children with learning disabilities and because of this, Davison personnel classified Andrew as a child with a learning disability and allowed him to enter the Davison program. (Testimony of Susan Rhoades on December 12, 1986). The DeKalb IEP, consistent with diagnoses throughout Andrew's educational history, determined that Andrew was seriously emotionally disturbed. Nevertheless, Sgt. Allread enrolled Andrew at Davison School, even though Davison is a program limited to learning disabilities and speech problems and precludes acceptance of children with Andrew's primary handicapping condition (AR 305).

Sgt. Allread instituted a due process hearing as the result of her disagreement with the school system's recommendation that Andrew be placed in a day program. After conducting a hearing, regional hearing officer John R. Shaw rendered his decision on June 27, 1986. The regional hearing officer concluded that Andrew required a residential component in addition to an educational day program. The regional officer ordered the IEP committee to reconvene and consider appropriate placements. The regional hearing officer also concluded that the Department of Human Resources violated Andrew's due process rights by failing to prepare a new IEP, discharging Andrew from GMHI summarily, and failing to contact the Local Educational Agency (LEA) regarding preparation of a new IEP.

Defendants appealed the regional hearing officer's decision to the State Hearing Officer, who conducted a second hearing. This hearing resulted in the State Hearing Officer's decision that the program offered by DeKalb County for Andrew was appropriate, that the Davison School was an inappropriate placement for Andrew, and that Sgt. Allread was not entitled to reimbursement for the cost of sending Andrew to Davison. (State Hearing Officer decision of August 26, 1986). Thereupon, an appeal was taken to this court for a determination as to the correctness vel non of the state administrative process. Plaintiff contends that the State Hearing Officer's decision is incorrect, that she is entitled to reimbursement for the expense of sending Andrew to Davison, and that Davison is an appropriate program for her son. Between the State Hearing Officer's decision on August 26, 1986, and the commencement of this trial on December 11, 1986, DeKalb defendants conducted independent family evaluations with the approval of this court. The evaluations were finally completed after considerable time, difficulty, and effort and not without the intervention of this court to cause the same to go forward. The results of these evaluations were heard at the trial along with the testimony of other witnesses and the presentation of other evidence.

## II. THE ISSUES AND THE LAW

### A. Defendants Ledbetter and the Department of Human Resources

Plaintiff contends that defendant Ledbetter, Commissioner of the Department of Human Resources (DHR), and the DHR committed two procedural violations. First, plaintiff maintains that these defendants violated the EHA and applicable regulations by failing to develop a new IEP for Andrew while he was at GMHI and failing to follow all aspects of Andrew's previous IEP. Second, plaintiff contends that these defendants failed to provide proper notice prior to discharging Andrew from GMHI. An analysis of these two claims must be made in light of the factual background discussed earlier.

When Sgt. Allread visited Atlanta in November 1985 Glenda Molton allegedly advised her that the Interstate Compact Agreement was the proper vehicle to transfer Andrew from Maryland to Georgia. The Interstate Compact Agreement's applicability in Andrew's case is questionable, however, because the compact applies to transfers from mental hospitals. See Off. Code Ga.Ann. §§ 37–10–1 to 37–10–3. In any event, Sgt. Allread initiated the com-

pact procedures to transfer Andrew. When Andrew arrived in Atlanta during the latter part of December, however, the compact documents had not arrived from Maryland. The State Hearing Officer determined that Maryland was responsible for the delay in completion of the paperwork. *See* State Hearing Officer decision at 27. Thus, Sgt. Allread admitted Andrew to GMHI on a voluntary basis.

█ The court finds that the DHR cannot be liable for failing to develop a new IEP for Andrew while he was at GMHI. From the outset, Sgt. Allread planned to reside in DeKalb county. All parties recognized that Andrew's placement at GMHI was temporary and would end when Sgt. Allread established residency in DeKalb county. Given the short duration of Andrew's tenure at GMHI, it would have been a waste of resources to develop a new IEP for Andrew.

█ While Andrew was at GMHI, GMHI followed Andrew's Maryland IEP with minor exceptions. For a variety of reasons the court concludes that DHR is not liable for any failure to comply fully with the Maryland IEP. First, Andrew was voluntarily admitted to GMHI, and GMHI complied with Andrew's IEP to the extent of GMHI's ability. Second, the court finds that Andrew progressed academically while at GMHI and notes that Sgt. Allread was pleased with Andrew's performance while at GMHI. Third, any procedural violation with respect to the IEP is not causally related to Sgt. Allread's decision to place her son at Davison School.

In addition to her claim for failure to follow the IEP, Sgt. Allread asserts liability against the DHR for failure to coordinate placement for Andrew upon his discharge from GMHI. Plaintiff contends that DHR's responsibility to assist in subsequent placement arises from 34 C.F.R. § 300.504 and a cooperative agreement. 34 C.F.R. § 300.504 requires a party to give written notice to the parents of a handicapped child prior to changing the child's educational placement. DHR admits that it did not provide this notice to Sgt. Allread. A cooperative agreement between DHR and the Department of Education in effect between August 19, 1985, and July 30, 1986, places a more stringent burden on the DHR. This agreement states:

> Prior to the release of a handicapped child from a hospital, DHR shall contact the responsible LEA to coordinate and ensure the continuation of special education and related services. To the extent that it is not a conflict with state law and rules and regulations the contact shall occur at least ten working days prior to the child's release.

The court finds that any techical violation of these provisions is insufficient to require the DHR to reimburse plaintiff for tuition at Davison. Andrew was discharged from GMHI on March 14, 1986. Prior to discharging Andrew, GMHI was in contact with DeKalb County regarding Andrew's situation. GMHI offered to let Andrew stay for an additional two weeks to allow for completion of the IEP process and permanent placement of Andrew. Sgt. Allread rejected this offer and enrolled Andrew at Davison instead. Thus, plaintiff is responsible for her voluntary decision to place Andrew at Davison.

### B. *The DeKalb County Defendants*

#### 1. *Appropriatness of Placement at Wesley Chapel*

The obligation of a local school agency to underwrite private placement is determined using standards established by the United States Supreme Court in the case of *School Committee of the Town of Burlington v. Department of Education of the Commonwealth of Massachusetts*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Plaintiff in this case has the burden of proof in contesting the decision of the State Hearing Officer. Under *Burlington* she must prove, first, that the IEP established by the DeKalb School System calling for placement at Wesley Chapel was inappropriate for Andrew and, second, that the private placement at Davison was proper under the EHA and the local school system IEP.

The first determination under *Burlington* is in regard to whether or not the IEP prepared by the school system is appropriate to meet the educational needs of the child. In making this determination, the decision in *Board of Education of the Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) is directive. The Supreme Court held that a court's inquiry into the appropriateness of an IEP is guided by the following two questions:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

458 U.S. at 206–07, 102 S.Ct. at 3051 (footnotes omitted).

The plaintiff has not contested the procedures followed by the local school system with regard to the development of the March 20, 1986, IEP and that it complied fully with the requirements of the EHA. The only question left for determination is whether or not the IEP is reasonably calculated to enable Andrew to receive educational benefits. Plaintiff would place importance on the argument that the school system committed procedural violations because it did not prepare an IEP for Andrew while he was a patient at GMHI. Plaintiff contends that the local school system had responsibility for the educational program of Andrew when Sgt. Allread arrived at Ft. McPherson, Georgia. She maintains that because she is in the Army, she was a resident of DeKalb County while she lived in the transient quarters at Ft. McPherson in Fulton County. She argues that she established her DeKalb County residency by filing a DD2058 form wherein she specified DeKalb County, Georgia as her legal residence. (Allread depo. p. 162).

The only purpose for the DD2058 form is to determine the correct state of legal residence for purposes of withholding state income taxes from military pay. (AR 1259). The form asks that the instructions be read carefully and defines "legal residence" as a permanent home to which the informant, whenever absent, has the intention of returning. The form further states that such intent to return must be indicated by certain actions, such as (1) registering to vote or (2) purchasing residential property or an unimproved residential lot, among other things. The form goes on to state that unless certain steps have been taken to manifest the intention to return to that location as a permanent home, it is doubtful that one's state of legal residence has changed. The form advises that failure to resolve doubts regarding residence by taking concrete steps to establish legal residence/domicile may adversely impact on certain privileges which depend upon legal residence. (AR 1259).

At the trial, Glenda Molten, a representative of the local school system, testified that she informed Sgt. Allread in every communication that she had with her that Sgt. Allread must be a resident of DeKalb County before the school system could become responsible for Andrew's education. (Testimony of Glenda Molton of 12/12/86 and Allread depo. p. 133). Ms. Molton says that she made it clear to Sgt. Allread at all times that such residency had to be established by physical location in the county. (Allread depo. p. 142). In view of relevant statutory and regulatory authority (20 U.S.C. § 1414(a)(1)(A), the Georgia Special Education State Program Plan, 34 C.F.R. § 300.220 (1986), O.C.G.A. § 20–2–152(b)), it appears obvious that a school system is obligated to provide educational services only to students who reside within that particular school system's district. Case law supports the same proposition. *See Martinez v. Bynum,* 461 U.S. 321, 103 S.Ct. 1838, 75 L.Ed.2d 879 (1983); *Horton v. Marshall,* 769 F.2d 1323 (8th Cir.1985); and *Harris v. Hall,* 572 F.Supp. 1054 (E.D.N.C.1983).

Although residency is a requirement to trigger the obligation of a school system to fund the education of a child, no law has been developed that precisely defines exactly what "residence" entails, either under the EHA or other relevant statutes. Current definitions of those terms relating to

residence indicate that at least physical presence is required. The Georgia courts have defined the term "resident" as "generally understood to mean more than mere physical presence and the transient visit of a person for a time does not make that person a resident." *Smiley v. Davenport*, 139 Ga.App. 753, 756, 229 S.E.2d 489, 491 (1976). The *Smiley* court was dealing, in fact, with the domicile/residence of a person in the military, noting that the Soldier's and Sailor's Civil Relief Act provided only the same right to a soldier to abandon his or her former domicile or residence and to acquire a new one the same as any other person. The court noted no special rights for those in the military in meeting residency requirements and in establishing new residencies. 139 Ga.App. 756–57, 229 S.E. 2d at 491–93.

Several federal courts have upheld state statutes that require more than physical presence as necessary to establish residency. In *Harris v. Hall*, 572 F.Supp. 1054 (E.D.N.C.1983), the court determined that a domicile requirement which included more than physical presence was a reasonable standard for determining residential status of students in the public school system. The court said that this holding was strengthened by the Supreme Court's continued holdings that "public education is not a right granted to individuals by the Constitution," citing *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) and *San Antonio Independent School District v. Rodriquez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). 572 F.Supp. at 1057. The *Harris* Court stated:

> A bona fide residence requirement implicates no "suspect" classification, and therefore is not subject to strict scrutiny. Indeed, there is nothing invidiously discriminatory about a bona fide residence requirement if it is uniformly applied. Thus the question is simply whether there is a rational basis for it.

572 F.Supp. at 1057 (quoting *Martinez v. Bynum*, 461 U.S. at 329 n. 7, 103 S.Ct. at 1842 n. 7).

 It would appear from the case law that the term "residency" in the con-

text of education would require at least physical presence or perhaps even physical presence with intent to remain. In Sgt. Allread's deposition she stated that she told Glenda Molton that she would be physically located in DeKalb County on the 21st of March, 1986. (Allread depo. p. 143). Because Sgt. Allread anticipated closing on her house on March 21, Ms. Molton agreed to schedule an IEP meeting on March 20, 1986. (Allread depo. p. 143). Thus, as soon as Sgt. Allread moved to DeKalb County the school system immediately took steps to formulate the appropriate IEP for Andrew. No procedural errors were made with regard to that individualized educational program for Andrew Hall.

Having determined that the IEP proposed by the school system complies with the procedures set forth in the Act and thus is not inappropriate due to any procedural violations, under *Rowley* the court must next determine whether or not the program offered by the school system is "reasonably calculated to enable the child to receive educational benefits." 458 U.S. at 207, 102 S.Ct. at 3051 (footnote omitted). The court concludes that the Wesley Chapel program offered as the educational placement for Andrew satisfies this requirement.

In attempting to clarify what "reasonably calculated to provide educational benefits" actually means, the *Rowley* Court analyzed the Congressional intent in the promulgation of the EHA. The Court concluded that Congress intended for the states to provide each child with special education services "as may be required to assist the handicapped child to *benefit* from special education." The "basic floor of opportunity" provided by the EHA consists of "*access* to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." 458 U.S. at 201, 102 S.Ct. at 3048 (footnote omitted, emphasis supplied). The *Rowley* Court explicitly rejected the "maximization of potential" standard adopted by the circuit court. Other courts have followed this analysis and have held that the EHA does not require a school system to provide the best possible edu-

cational services, but requires only that the provision of services will be beneficial to a handicapped child.

Following the *Rowley* guidelines in determining whether or not an IEP providing only for day placement would benefit a handicapped child, the court in *Abrahamson v. Hershman*, 701 F.2d 223 (1st Cir. 1983) noted that:

> It follows from *Rowley* that the Act does not authorize residential care merely to *enchance an otherwise sufficient* day program. A handicapped child who would make educational progress in a day program would not be entitled to placement in a residential school merely because the latter would more nearly enable the child to reach his or her full potential. A school committee is required by the Act merely to ensure that the child be placed in a program that provides opportunity for some educational progress.

701 F.2d at 227 (footnote omitted). The court went on to hold that placing a child in a residential program when it is unnecessary to enable him to make educational progress may also violate the Act's mainstreaming provisions. *See also Matthews v. Davis*, 742 F.2d 825 (4th Cir.1984) (if a school system can provide an appropriate education in a day only program, further enhancement not required); *Hessler v. State Board of Education of Maryland*, 700 F.2d 134 (4th Cir.1983) (availability of a better private program would not render inappropriate an otherwise sufficient public school program); and *Darlene L. v. Illinois State Board of Education*, 568 F.Supp. 1340 (N.D.Ill.1983) (the EHA does not require provision of the most appropriate learning environment; it requires only provision of meaningful access to an appropriate education).

A psychometrician at Wesley Chapel personally observed Andrew and reviewed test data and other pertinent records to determine that he was in need of a highly structured program where limits and expectations were consistent and clear. The psychometrician believed that Wesley Chapel would be the least restrictive environment in which Andrew's educational needs could be addressed. (AR 610–613). After an eligibility report was prepared and it was determined that Andrew qualified for the seriously emotionally disturbed program, the IEP Committee drew up extensive long range goals and short term behavioral objectives. As evidenced by her signature on the agreement, Sgt. Allread deemed these goals appropriate. (AR 614). The March 20, 1986, IEP prepared for Andrew by the School System would enable Andrew to receive the educational benefits described and required by *Rowley*.

The Wesley Chapel program is the type of program that has been recommended for Andrew since before the time he left Carl Sandburg School for RICA. The experts who testified on behalf of the school system recommended a psychotherapeutic milieu in an educational program for Andrew. Furthermore, the plaintiff's expert, Dr. Figueroa, testified that a phychotherapeutic program was a necessity for Andrew based upon his knowledge of the subject during the period from mid–1984 to early 1985. Dr. Raque, the Allread family's present therapist, testified that a therapeutic milieu is not necessary for Andrew but he did note that Andrew performed better at RICA (a therapeutic environment) than he is performing at Davison, a non-therapeutic environment.

Dr. Figueroa testified that Andrew needs a program where the goal of treatment would be to enable him to gain insight into his behavioral problems in order to learn how to control them. According to Dr. Figueroa, Andrew needs an educational program that will deal with his inappropriate behavior. Wesley Chapel is a psychotherapeutic day program that will provide Andrew with individual, family, and group counseling with immediate crisis intervention when behavioral problems arise in order to help him gain such insight.

■ In addition to the goal of a treatment which will enable Andrew to gain insight into his behavioral problems, the Wesley Chapel program will provide Andrew with the least restrictive environment. Thus, Andrew would have the op-

portunity to be more quickly mainstreamed into a regular education school when that becomes possible. At Davison, Andrew is in the most restrictive residential environment. The law provides unquestionably that educational agencies must adopt those programs that will enable the child to be in a least restrictive environment. 20 U.S.C. § 1412(5)(B). It goes on to provide that to the maximum extent appropriate handicapped children ought to be educated with children who are not handicapped.

Regulations promulgated pursuant to the Act provide further comment, noting that every state educational agency must ensure that no child in an institution who is capable of education in a regular school setting may be denied access to an education in a regular school setting. 34 C.F.R. §§ 300.550, 300.554 (1986).

Case law also appears to mandate that school systems provide educational programs with a goal of mainstreaming. In *Rowley,* the court emphasized that mainstreaming could, of course, only be effectuated to the "maximum extent appropriate," 458 U.S. at 202–03, 102 S.Ct. at 3049. The implication is that, while a handicapped child would not necessarily be educated in the same classroom with non-handicapped children, he must be provided with the program that would give him the best opportunity of ultimately being able to go into the regular classroom even taking into consideration all of his needs. *See Mark and Ruth A. v. Grant Wood Education Agency,* 795 F.2d 52 (8th Cir.1986) and *Manuel R. v. Gordon M. Ambach,* 635 F.Supp. 791 (E.D.N.Y.1986).

Sgt. Allread has rejected the School System's offered placement of Andrew apparently only because it did not provide a residential component notwithstanding that a program such as Wesley Chapel had been recommended by virtually all experts who have dealt with Andrew. It is her contention that he needs the residential component because he did not change behaviorally while he was in the Carl Sandburg program (AR 620). Because of her insistence that Andrew receive residential placement, a day therapeutic educational program has

never been tried with Andrew. Sgt. Allread contends that Andrew needs a residential environment component because he has been diagnosed by some professionals as having an organic personality disorder. Sgt. Allread believes that his problems have come from within him and that the environment has nothing to do with his behavior. (Allread depo. p. 101). From about age three, however, a psychologist noted that Andrew's behavior was characteristic of the behavior of a traumatized child to the realities of his world, and "represented a behavior disorder, reactions to stress, separation and loss, feelings of intense sibling rivalry and some perceptual and coordination problems." (Solomon, AR 949).

In May of 1986, on behalf of the school system, Dr. Robin Morris did extensive neuropsychological testing on Andrew and found nothing that would require residential placement for Andrew. He determined that it would be necessary to evaluate Andrew's environment outside of school, especially his family environment in order to complete the evaluation (AR 960). Dr. Richard Ward, a psychiatrist who appeared as a witness for the school system in the administrative proceedings, agreed with Dr. Morris that Andrew's need for placement out of the home rested upon factors outside of Andrew's own functioning (i.e., his family) and was, therefore, beyond the scope of his psychiatric evaluation because he was not allowed to evaluate the family (AR 1672–74). Sgt. Allread had refused to allow Dr. Ward to conduct the family evaluations that were ultimately suggested by the court because she resented something that Dr. Ward had stated in his evaluation. It was necessary for the DeKalb School System to obtain other experts to evaluate the family environment as a result.

The family evaluations were done by several experts of the School System, including neuropsychologists, psychiatrists, and neurologists. These experts concluded, consistent with the plaintiff's own expert, Dr. David Raque, that the family situation had significantly affected Andrew's behavior. The experts of each side differ only

with regard to Andrew's need for residential placement and the severity of his condition. Plaintiff's experts have diagnosed Andrew as an Organic Personality Disorder child, while the School System's experts have diagnosed his condition as Attention Deficit Disorder with Hyperactivity and Oppositional Disorder. While all experts in this case are credible, some are more so than others. Nevertheless, there seems to be a consensus that the diagnosis is actually of no consequence and it really does not matter what Andrew's condition is called. The severity of the condition is the important factor to be considered. (Testimony of Dr. Raque of December 11, 1986).

The School System's experts agreed that none of their diagnoses required a residential placement for Andrew. Dr. Raque, however, testified that Andrew's condition was so severe that it did require a 24 hour placement. Dr. Raque, neither a neurologist nor a neuropsychologist, based his opinion on the fact that Andrew has a seizure disorder and upon his opinion that Andrew has an Organic Personality Disorder. He based his diagnosis on the results of Dr. Robin Morris' neuropsychological testing which he interpreted as evidencing tissue damage, a conclusion with which Dr. Morris does not agree.

Dr. Nicolas Krawiecki, a pediatric neurologist retained by the School System, testified after an extensive review of Andrew's records and a thorough neurological examination of Andrew himself on November 6, 1986, that Andrew has a mild seizure disorder. He based his opinion on Andrew's medical records, which indicate that his recorded seizures were febrile, or seizures caused by fever, and the prognosis of such a seizure disorder is very good. Dr. Krawiecki noted that Andrew's neurological examination was normal, and that he possessed only minimal brain dysfunction as evidenced by the results of Dr. Morris' neuropsychological testing.

Dr. Krawiecki further testified that there is "little correlation" between Andrew's minimal brain damage and his behavior. It was his belief that Andrew's behavior could be explained only by looking outside of Andrew and his neurological functioning.

Dr. Morris testified that Andrew showed signs of dysfunction of the cognitive systems that are typically correlated with the regulation of emotional responses and behaviors (AR 958–959). Nevertheless, he did not think that Andrew's imperfect neurological system was severe enough to require residential placement. He also stated that neither the test results nor his report in any way indicated that need, demonstrating that Dr. Raque had incorrectly interpreted the test results. Dr. Morris concluded that it was Andrew's environment, especially his home environment, that was a major factor other than the minimal brain damage causing problems in his behavior. (AR 959). In his testimony of December 11, 1986, Dr. Raque testified that he did not take issue with any portion of Dr. Morris' report and that he relied on the report in arriving at his opinions relating to Andrew's condition. Inasmuch as Drs. Morris, Ward, and Krawiecki did not have the opportunity to go beyond Andrew's neurological and neuropsychological condition in their evaluations, the testimony of Drs. Slayden, Jurkovic, and Raque becomes important. Because they have been involved with the Allread family for the purpose of evaluation, they have had firsthand knowledge of Andrew's home environment.

All experts appear to agree that Andrew's environment is an extremely important factor in explaining his behaviorial difficulties. In psychology and psychiatry, disorders are described and labeled as psychological stressors. These stressors are considered significant contributors to the development or exacerbation of a current disorder. The environmental stressors in Andrew's case were coded to be "Severe" by Dr. Slayden, "Severe to Extreme" by Dr. Jurkovic (testimonies of December 12, 1986), and "Severe" by the psychiatrists who dealt with Andrew at GMHI. (DeKalb's Ex. 5, p. 39). Drs. Slayden and Jurkovic agreed that these stressors still exist in the Allread family and that they would continue to affect Andrew's behavior. They believed that over the years they

had greatly contributed to and exacerbated his problems. Dr. Jurkovic reported in his evaluation that "it is apparent that they [the Allread family] have experienced severe stress over the years due to numerous life cycle disruptions and characteristics of their family interaction style." (DeKalb's Ex. 9 p. 4). Dr. Slayden testified that Andrew's stressors center upon family dysfunction and include divorce, alleged child abuse, conflict in the family, serious economic pressure, numerous family moves and numerous changes in the context of the household. He noted that the family had difficulty and sometimes an inability to resolve conflicts because of the turmoil within the family most of the time. (Testimony of December 12, 1986).

Dr. David Raque, the Allread family psychologist who testified at the trial of December 11 and 12, 1986, does not seem to disagree with the opinions of Drs. Slayden or Jurkovic. Dr. Raque testified that the family had definitely contributed to and exacerbated Andrew's problems and that the family needed "a lot of work." In his family evaluation Dr. Raque stated that the Allread family had some significant stresses and because of these stresses the more frequent changes have exacerbated an already existing problem. (Plaintiffs' Ex. 1, p. 6).

Plaintiff's experts support Sgt. Allread's notion that Andrew's Organic Personality Disorder combined with his seizure condition is the principal force behind his apparent behavior and that the condition of the home environment will not be significant in relation to his behavior. It is at this point where plaintiff's experts begin to diverge in their opinions with those of the School System's experts as to which facet of Andrew Hall's condition is most severe. The DeKalb defendants contend that the evidence submitted at trial, including expert testimony, indicates that Andrew's overall condition is mild, including his Attention Deficit Disorder and his Seizure Disorder, and that the only severe facet of his condition would be that related to his environment, especially his family environment.

While the School System's experts believe that Andrew's environmental stressors in the home are severe, none of them would recommend that he receive residential treatment. Dr. Jurkovic concluded that Andrew should be able to live at home, especially in light of the fact that the Allread family was working in therapy to reduce conflict and that, if Andrew were in a therapeutic environment, the family could receive support from the school staff. (DeKalb's Ex. 9 p. 6). Dr. Slayden's testimony was similar to that of Dr. Jurkovic, concluding that the family has reached a point of being able to provide more consistency for Andrew in that the mother now has a steady job, they have a permanent home, and the goings and comings of outsiders are now going to be kept at a minimum. (Testimony of December 12, 1986).

The School System's experts agreed that a disruptive home environment would be detrimental to Andrew's progress. Nevertheless, the experts concluded that even if Andrew were unable to live at home, a residential treatment facility still would not be required or recommended. The experts stated that all that would be required for Andrew after school hours would be some sort of supervision by a knowledgeable housekeeper or family friend. If some program were needed outside the home environment, it need not be any more than room and board. The essence of the School System's evidence is that there is nothing intrinsic about Andrew that would demand a residential placement. The School System contends that Andrew should be able to live at home and attend the Wesley Chapel program. The School System also contends that if his family is unwilling or unable to provide Andrew with the proper environment in the home, any requirement for 24–hour care would be indicated for Andrew for "family" and not "educational" reasons, and it would therefore not be the responsibility of the School System. Thus, the central question would become whether or not a residential component to Andrew's educational program falls within the definition of "free, appropriate public education," "related services," or "special education." A local edu-

cation agency is required under the law to provide a "free appropriate public education" to handicapped children residing within the school district. The term "free appropriate public education" is defined as follows:

[S]pecial education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under Section 1414(a)(5) of this title.

20 U.S.C. Sec. 1401(18).

The term "special education" means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and *instruction in hospitals and institutions.*

20 U.S.C. Sec. 1401(16) (emphasis supplied). Finally, the term "related services" is defined as meaning:

[T]ransportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as *may be required to assist a handicapped child to benefit* from special education, and includes the early identification and assessment of handicapping conditions in children.

20 U.S.C. § 1401(17).

The regulations promulgated pursuant to the act include a provision for residential programming, including non-medical care and room and board at no cost to the parent or child, 34 C.F.R. § 300.302 (1986), but there is no explicit statutory provision stating when and under what circumstances a local school system must provide a residential component in a child's edu-

cational program. While the United States Supreme Court has not dealt with the issue, some federal courts have addressed the issue.

*Ahern v. Keene,* 593 F.Supp. 902 (D.Del. 1984), is similar to the instant case. *Ahern* concerned a trainably mentally handicapped Down's Syndrome child who also suffered from problems that could be traced to her home environment. The child's home environment had a limited capacity to engage her emotionally. 593 F.Supp. at 906–07. The court noted that it needed to analyze the issue of residential placement in terms of whether or not such placement would be necessary for educational purposes, or whether the residential placement would be in response to medical, social, or emotional problems that are "segregable from the learning process." *Id.* at 913–14. The court concluded that a residential component was not necessary to provide the student with an appropriate education. It said:

First, I find that Alicia's emotional problems are "segregable from the learning process." Testimony and documentary evidence in this case confirm that Alicia's emotional problems, exhibited primarily in response to a stressful home environment, were not interfering with her ability to *benefit* from the special education at Bush [day school].

*Id.* (emphasis added, footnote omitted).

On the other side of the coin is the case of *Kruelle v. New Castle County School District,* 642 F.2d 687 (3d Cir.1981). There, the court was asked to consider whether a profoundly retarded child with palsy who was unable to walk, dress or feed himself, required a residential component in his education program. The court concluded that consistency of programming and environment was critical to Paul's ability to learn and the absence of such a structured environment would contribute to his physical infirmaties to such an extent that his ability to learn would be fundamentally frustrated. 642 F.2d at 694. The *Kruelle* court, in making the decision in that case that residential placement was necessary, nevertheless, made it clear that in deciding

any case a court should focus its analysis on whether full-time placement is necessary for educational purposes rather than medical, social, or emotional problems that could be separated from the learning process. 642 F.2d at 693.

The court believes that Andrew's problems are segregable from the learning process and that there is nothing intrinsic in Andrew's condition that would necessitate residential placement in order for him to learn. Andrew's behavioral problems are specifically reactive to his environment and especially to his family environment which is stressful. There is no question but that Andrew is a bright child who can learn in any proper education environment. As Dr. Raque testified, if Andrew were to return home and attend the Wesley Chapel program he would be able to learn. (Testimony of December 11, 1986). Dr. Raque stated that when Andrew returned home he would become a management problem. Dr. Raque also testified that Andrew would have difficulty in making the adjustment without some kind of highly structured full-time supervision. But, at the same time, Dr. Raque agreed that any child could do better in a highly structured environment and that the educational process was not envisioned to "take care" of children in this way be they behaviorally normal or behaviorally abnormal. (Testimony of December 11, 1986).

The IEP prepared by the DeKalb School system for Andrew calling for his placement in the day therapeutic Wesley Chapel School is appropriate and reasonably calculated to provide him with educational benefit. The evidence supports this conclusion and the plaintiffs have not proved otherwise

### 2. *Appropriateness of The Private Davison School*

■ Further inquiry is now directed to the reimbursement issue on the basis of whether or not the Davison School placement was appropriate. Not only must the parent prove that the IEP was inappropriate, she must also prove that the private placement chosen was proper under the EHA. Sgt. Allread has been unable to prove that the Davison School was proper for her son under the requirements of EHA.

Davison School is inappropriate for Andrew for a number of reasons. The school is not the least restrictive environment for Andrew, and it is not a school that is equipped to address his handicapping conditions. It is not a psychotherapeutic milieu, which clearly has been the educational program recommended by professionals for Andrew Hall since before he left Carl Sandburg.

The child is required to be placed in an educational program that is as unrestrictive as possible and that would provide him with the opportunity for immediate mainstreaming into the regular classroom. He is clearly in the most restrictive environment at Davison because he is in the residential program there. Davison School is not a school for seriously emotionally disturbed children. According to Susan Rhoades, who testified for plaintiff and who is on the faculty at Davison School, a seriously emotionally disturbed child will not be admitted to Davison School. She testified that although the school had concerns about admitting Andrew to Davison because he had a diagnosis of Organic Personality Disorder, after consulting with a professional she classified Andrew as learning disabled instead of seriously emotionally disturbed so as to allow him to enter the program. (Testimony of December 12, 1986).

All other witnesses and evaluators who have knowledge of Andrew Hall testified that his primary handicapping condition was seriously emotionally disturbed. Dr. Raque testified that Andrew was seriously emotionally disturbed and that he would not meet the definition of learning disabled under the law. The term specific learning disability excludes children who have learning problems that are primarily the result of emotional or environmental disturbances. 34 C.F.R. § 300.5(b)(9) (1986). Being seriously emotionally disturbed, Andrew Hall should not be placed in a school that is state certified to teach only pro-

grams for specific learning disabilities, speech/language impairments, multiple handicaps, and hearing impairments. Dr. Janie Smith, the State Department of Education's witness who is responsible for private school certification for state funding, testified that Davison is a school certified for those programs only. She pointed out that on the approval form submitted by Davison School to the State, a Davison representative clearly specified that a handicapping condition of seriously emotionally disburbed would preclude a child's admission. (Testimony of December 12, 1986).

In *Schimmel v. Spillane*, 630 F.Supp. 159 (E.D.Va.1986), the district court determined that a private placement chosen by the parents was inappropriate because it did not meet the state's requirements for approval as a special education school. The court went on to conclude that funding by the LEA was not proper because the private placement chosen by the parents was not approved under state standards. The court noted that:

> Parents of handicapped students may not, because of personal desires, select a private institution of their choice and have the school system pay for the tuition. While the desires of the parents may be well motivated in that they seek the best for their child, the placement decision must be made by the school system in accordance with approved standards.

630 F.Supp. at 162. *See also Smrcka v. Ambach*, 555 F.Supp. 1227 (E.D.N.Y.1983).

Davison School, not being able to effectively deal with Andrew's handicap by its own admission to the State of Georgia, is likewise unable to provide him with an environment of similarly functioning children. Susan Rhoades testified that Andrew is in the highest functioning class at the Davison School where the IQs of the children in that class run from 80 to 115. (Testimony of December 12, 1986). She testified that Andrew's IQ has been recorded as anywhere between 105 to 120, thus making him probably the most intelligent child in his class. Dr. Slayden observed Andrew's classroom and observed that the age range was from 12–17 making Andrew not only the smartest child but also the youngest. It was his opinion that this could be harmful to Andrew educationally, as he could become bored with the classroom activities because a large majority of the class would be behind him and would thus prevent him or seriously impede him from being able to move ahead academically. (Testimony of December 12, 1986).

Davison has been shown not to be a psychotherapeutic milieu, just as the Carl Sandburg School was not. It has no psychiatrist or psychologist on staff and does not provide individual, group, or family therapy. As Susan Rhoades testified, the Davison School has maintained him, but there is no evidence that Davison will be able to change him. Davison has not attempted to help Andrew find out what is causing him to lose control of his behavior or, as suggested by Dr. Figueroa, gain insight into his difficulties.

According to Dr. Figueroa, Andrew needs an environment where the curriculum will involve his learning methods of behavior control and his internalization of these controls. (Testimony of December 11, 1986). Dr. Jurkovic noted in his report that it is critical that Andrew, as he approaches adolescence, learn to manage himself and not just allow others to manage him. (DeKalb's Exhibit 9, p. 5).

The School System's IEP proposing the Wesley Chapel day program for seriously emotionally disturbed children is appropriate and is reasonably calculated to provide special educational benefit to Andrew Hall. The Davison School program is inappropriate for Andrew's needs because it is a school for the learning disabled and is residential. The evidence is clear that Andrew Hall does not need residential placement in order to learn and benefit from special education. The plaintiff's requests for a declaratory judgment and for reimbursement of the cost of the Davison School are therefore DENIED.

### C. Defendants Rogers and the State Board of Education

Plaintiff's claim against defendant Dr. Werner Rogers, State School Superintendent, and the State Board of Education apparently is vicarious in nature. As previ-

ously discussed, plaintiff contends that De-Kalb County and the DHR violated Andrew's rights under the EHA. Sgt. Allread maintains that the State Board of Education is responsible for ensuring that state and local agencies comply with the EHA. In this regard, plaintiff cites 20 U.S.C. § 1412(6), which states:

> The State educational agency shall be responsible for assuring that the requirements of this subchapter are carried out and that all educational programs for handicapped children within the State, including all such programs administered by any other State or local agency, will be under the general supervision of the persons responsible for educational programs for handicapped children in the State educational agency and shall meet educational standards of the State educational agency.

The court, however, has found that neither DeKalb county nor the DHR has committed any violation of the EHA sufficient to warrant the relief plaintiff seeks. Thus, the court holds that the State Board of Education is not liable for failing to properly supervise the other defendants.

Accordingly, the Clerk of Court is hereby ordered to enter judgment for the defendants.

SO ORDERED.