**ASHLAND SCHOOL DISTRICT, Plaintiff–Appellant,**

v.

**PARENTS OF STUDENT R.J., Defendants–Appellees.**

**Civil No. 07–3012–PA.**

United States District Court, D. Oregon.

Oct. 6, 2008.

---

6. Dkt. No. 25.

Nancy J. Hungerford, Richard G. Cohn–Lee, The Hungerford Law Firm, LLP, Oregon City, OR, for Plaintiff–Appellant.

Mary E. Broadhurst, Mary E. Broadhurst, PC, Eugene, OR, for Defendants–Appellees.

## OPINION AND ORDER (Sealed Case)

PANNER, District Judge.

Plaintiff Ashland School District (the "District") brings this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i). The nominal defendant is a teenage student who, for privacy reasons, will be referred to by the pseudonym "R.J." [1]

On December 8, 2006, a state Administrative Law Judge ("ALJ") ruled that the District had failed to offer R.J. what the IDEA characterizes as a "Free Appropriate Public Education."

The ALJ concluded R.J.'s parents ("Parents") were legally justified in removing R.J. from the District and, at a later date, transporting her to a private behavioral modification facility in another state, which the parties refer to as "residential placement." The ALJ ordered the District to reimburse Parents for expenses they in-

---

1. Because the attorney in an IDEA action usually represents the parents—whose objectives are not always congruent with the views articulated by the child—the court has revised the caption to reflect that the real parties in interest are the parents. A parent is a proper party in an IDEA action. *Winkelman v. Par-* *ma City School Dist.,* 550 U.S. 516, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007). The caption has been further modified in an effort to protect the identity of the student and the family, given the persistence and wide availability of electronic documents.

curred to have R.J. "escorted" to that facility and the fees charged by the private company operating the facility. The ALJ declined to order reimbursement for costs associated with a prior residential placement. Parents did not appeal the latter determination.

The District appeals. While this litigation was pending, the court entered a "stay-put" order, which required the District to pay the costs of the facility where R.J. was housed, pending resolution of this litigation. That order was not a determination of the merits. For the reasons that follow, the District's appeal of the ALJ's decision is granted and the decision of the ALJ in favor of Parents is reversed.

### Legal Standards

Parents contend the ALJ's decision is reviewable only for abuse of discretion. That is incorrect. *See Forest Grove School Dist. v. T.A.*, 523 F.3d 1078 (9th Cir.2008) ("no case supports T.A.'s contention that we review *the hearing officer's decision* for abuse of discretion") (emphasis in original).[2]

■ Rather, the standard of review in IDEA actions has been characterized as modified *de novo* review. *Katherine G. v. Kentfield School Dist.*, 261 F.Supp.2d 1159, 1167 (N.D.Cal.2003). *See also Seattle School Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir.1996), *abrogated in part on other grounds by Schaffer v. Weast*, 546 U.S. 49, 56–58, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). The reviewing court makes an "independent decision[ ] based on the preponderance of the evidence." *Board of Educ. of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 205, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The court may thus decide questions of law and fact. The court is further authorized to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). This language confers "broad discretion" on the district court. *Forest Grove*, 523 F.3d at 1084. However, courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034.

■ Because the state is thought to have "specialized knowledge and experience," "due weight" is given to the ALJ's determinations, *id.* at 208, 102 S.Ct. 3034, with greater deference to findings that are "thorough and careful." *Capistrano Unified School Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir.1995).

■ The School District, as the party challenging the administrative decision, bears the burden of persuasion. *See Schaffer*, 546 U.S. at 56–58, 126 S.Ct. 528; *Ms. S. v. Vashon Island School Dist.*, 337 F.3d 1115, 1127 (9th Cir.2003) ("In the district court ... the burden of proof is on the party challenging the administrative ruling").[3]

### Findings of Fact

After reviewing the record, I conclude that the ALJ's factual findings—though exhibiting considerable effort—omit or misstate some important facts. The ALJ also made some questionable cause-and-effect assumptions. Therefore, I have giv-

---

**2.** Parents also rely on *Parents of Student W. v. Puyallup*, 31 F.3d 1489, 1497 (9th Cir.1994). It is not on point. The deferential standard the Court of Appeals employs when reviewing a district court's decision granting or denying equitable relief is not necessarily the standard applied when this court reviews a decision by an administrative hearing officer under the IDEA.

**3.** *Schaffer* abrogated the prior sentence in *Vashon Island* (which read "At the administrative hearing, the school district has the burden of proving that it complied with the IDEA.")

en due consideration to the ALJ's factual findings, but also independently evaluated the evidence and made my own factual findings and drawn my own conclusions when appropriate, as is permissible in an IDEA case. I have found the testimony by the District's witnesses in this case generally to be more credible than certain witnesses for Parents, especially those who were employed by (or consultants for) the private company that operates the two residential facilities.

Parents adopted R.J. when she was 4–1/2. Shy and withdrawn at first, R.J. eventually warmed to her new family. A voracious reader from an early age, R.J. attended a magnet school for gifted children. Mother[4] reports R.J. was very bright, but also disorganized, easily distracted, and underachieving in school. "It was always a problem of handing in homework even when she did it." R.J.'s social skills also appeared less developed than some peers. Mother recalls R.J. was "always quick to make friends but had trouble keeping them," and seemed immature for her age.

In second grade, R.J. was diagnosed with the "inattentive" form of Attention Deficit/Hyperactivity Disorder ("ADHD" or "ADD"). R.J. was found eligible for special services under the IDEA. She was placed on Ritalin, but the medication had undesirable side effects. Mother describes R.J. as "zombie like" when taking Ritalin. Parents elected to discontinue Ritalin, and R.J. completed elementary and middle school without it.

In Fall 2001, the family relocated to Ashland, Oregon. Moving to a new state and school was difficult at first. In November 2001, the School District had R.J. evaluated by school psychologist Janell Walton. R.J. achieved average to above average scores on most tests of intelligence and functioning. She achieved "superior" scores in long term memory and knowledge of general factual information, and demonstrated an above average Verbal IQ and vocabulary. Areas of weakness included mathematical reasoning, short-term memory, and concentration. A very low score on a copying exercise suggested some difficulty paying attention to details. R.J. also evidenced some difficulty in reading social cues and in sequencing events (determining what happened first, middle, and last).

Two seventh grade teachers completed a survey, offering their subjective impressions of R.J. On most issues, the teachers disagreed. One rated R.J. in the top ten percent of the class for intellectual functioning and noted no "clinically significant" problems. The other teacher rated R.J. in the bottom ten percent of the class intellectually, and noted "clinically significant" attention problems (which included being easily distracted, not keeping her desk clean and not completing assignments on time). Among the few points of agreement between the two teachers was that R.J. "like[d] to be alone," was not disruptive in class, and could easily be distracted.

The 2001 Walton evaluation concluded that R.J. had no specific learning disabilities or communication problems to warrant classifying her as having a disability. An "assessment of intellectual ability and academic achievement show commensurate scores." However, Walton concluded, R.J. "presents a profile suggestive of difficulty with the control of attention." Walton also noted R.J. previously had received a "medical diagnosis of an Attention Deficit Disorder." The District therefore concluded that R.J. was eligible for services under the IDEA. With Parent's approval, an In-

---

4. Unless otherwise stated, any references in this opinion to R.J.'s mother, father, parents, sister or other relatives are to her adoptive family.

dividualized Education Program ("IEP") was established for R.J.

The person preparing the IEP described R.J. as "a delightful girl," a view echoed by many of R.J.'s teachers and advisors throughout her school years. The IEP describes R.J.'s many strengths, and a few areas needing improvement. The 2001–02 IEP included, among other things, special emphasis on organizational skills, 30 minutes of counseling each week, and additional time to complete assignments and exams. She was to complete an agenda each day, track class assignments, and work on her homework in the Resource Center under the supervision of a special education teacher. The IEP also notes the school counselor was "in the process of putting together a group for girls focused toward cause and effect/sizing up social situations/ and social interactions" and that R.J. wished to participate in that group.

R.J. attended seventh and eighth grade at Ashland middle school, earning grades ranging from A's to C's. As was the pattern throughout her education, the grade R.J. earned in a class seemed to depend on her level of interest. She rarely had much difficulty understanding the material, but sometimes failed to turn in assignments. The ALJ attributed such failures to ADHD, reasoning R.J. must have forgotten she had homework or was unable to plan adequately. However, the record suggests R.J. usually knew she had assignments due, but preferred to engage in more pleasurable activities of her choosing.

In May 2003, R.J. was due to graduate from middle school. Mother felt R.J. was socially immature and "[c]ringes when she thinks about R.J. at the High School." Mother therefore had R.J. repeat eighth grade. During 2003–04, R.J. received acceptable (or better) grades, though she still had difficulty mastering geometry. Some teachers questioned whether she was utilizing her full potential, believing her capable of better work.

A report from a teacher, dated December 2003, opined that R.J. "knows exactly" what she's supposed to do. However, "if R.J. doesn't feel that something is important or entertaining, she won't do it until an adult insists." This teacher also opined that R.J. "learn[s] a lot through listening, and can pick up what we are doing quickly, but the instant she thinks she can get away with it, she pulls out a reading book."

By 2002 to 2003, Parents were experiencing marital problems. They separated in December 2003. For the next two years, R.J. resided one week with Mother, and the next week with Father, and then back again.

A "transitional IEP" meeting was held on April 29, 2004, to plan for R.J.'s transition to High School in the Fall. The meeting was attended by R.J., Mother, and various District personnel. Meeting notes characterize R.J. as a "calm and mellow person—making great progress" who "works independently—extremely helpful!" She tended to be a "procrastinator," secretly "read during class," needed organizational skills, sometimes lost assignments, and was "not always honest about missing assign[ments.]" She was "very quiet" and had no disciplinary problems. Most of her friends were younger.

The participants agreed on a transitional IEP and to meet again in December 2004 to evaluate her progress.

A progress report, dated June 11, 2004, noted R.J. continued to experience some difficulty staying focused. She was sometimes tardy, failed to complete homework, tended to read a book in class rather than listen to the lecture, and could use some help with test taking skills.

R.J. was optimistic when High School began in September 2004. She initially

performed well, but personal problems soon overtook her. On October 6, 2004, R.J. met with an on-campus counselor,[5] Tricia Hibner. R.J. wanted "someone to talk to." Her main concerns were the recent breakup of Parents' marriage, and Father's possible imminent remarriage. In addition, her older sister—with whom R.J. was close—had recently moved away to attend college. R.J. had been feeling moody and anxious recently. She also seemed a bit naive. Hibner's overall impression from that interview was of a normal teenager. Hibner diagnosed R.J. with Adjustment Disorder, based on the recent changes in her life regarding her parents and sister.

Around this time, R.J. also discovered boys. In either Summer or early Fall 2004, R.J. began dating "T." Not long afterwards, an incident occurred between them, which allegedly involved some sort of unwanted sexual conduct. During the next 12 to 18 months, R.J. oscillated between saying she wanted nothing further to do with T. but then secretly seeing him.

Preoccupied with personal matters, R.J.'s school work began to suffer. She also exhibited signs of depression. With regard to the timing and sequence of certain events that followed, the record contains contradictory statements, sometimes from the same witness. Mother believes certain events occurred in October or November 2004, *i.e.*, prior to the December 2004 IEP meeting, but other evidence strongly suggests those events occurred after the December 2004 IEP meeting, in December 2004 or early 2005.[6] The timing for some other events is relatively well documented.

In early October 2004, the District requested—and Mother granted—permission for R.J. to be re-evaluated in contemplation of the December 2004 IEP meeting. Testing in October 2004 again indicated a range from average to superior academic ability, with high scores in reading and lower scores in mathematics.

R.J.'s "progress report" (interim report card) for September and October 2004 included a range of grades. She received A's and B's in several classes she liked, but lower grades from one teacher (who cited missed homework assignments). Most of R.J.'s teachers made positive comments ("Work Improving," "Friendly and Positive," "Pleasure to have in Class," "Good Effort").

In late November 2004, R.J. was re-evaluated by school psychologist Walton. R.J. again scored average or above average in most areas. She displayed some weakness in attention to detail, concentration, fine-motor tasks, and ability to sequence events. Two teachers offered subjective evaluations of R.J. As with the 2001 evaluation, there were marked differences in how the teachers viewed her on some issues.

In Walton's opinion, the evaluations did not show that ADHD had "a significant impact on R.J.'s classroom performance. R.J. received average range scores on both scales of inattention and hyperactive/impulsive problems." Walton did feel R.J. could improve on some "inattentive behaviors," including her proclivity to read a book in class instead of listening to the lecture.

Walton concluded R.J. was demonstrating improvement compared to the 2001

---

5. The counselors apparently are not employed by the District, but have an arrangement by which they provide service to students on campus. The District reportedly paid for R.J.'s counseling, but her discussions with the counselor were to be kept confidential.

6. Although Mother likely was mistaken regarding the precise dates or sequence of events, it appears to be an honest error. She was testifying from memory about emotional events that transpired nearly two years earlier.

evaluation, but acknowledged that inattentive behaviors can be harder to identify in older children.

On November 29, 2004, Mother took R.J. to a doctor "for independent evaluation prior to school IEP evaluation upcoming next week." The doctor was told that R.J. had recently broken up with a boyfriend, was upset over family issues, and had briefly experienced "suicidal ideation with thoughts of self-mutilation." The chart note also reports R.J. was "often not turning in [school] assignments with a 'lack of interest'" and had been diagnosed with "ADD and depression" as a first grader.

Chart notes from a followup appointment, a week later, indicate that R.J.'s depression and anxiety seemed much improved. The chart also states that "Mother receives frequent phone calls from school regarding incompletion of school work" and "would like to initiate Strattera over Christmas break with hopes of behavioral improvement as soon as possible."

Two days later, the December 2004 IEP meeting was held. Mother apparently brought a note from the doctor's office, which stated "R.J. has been evaluated in our office for Attention Deficit Disorder. Lab work indicates no abnormalities." The IEP team received a report from Walton, who reported there was no evidence ADHD was significantly impacting R.J.'s school work. The IEP team decided that R.J. remained eligible for IDEA services. The existing IEP was renewed, with a few changes such as "preferential seating" (meaning R.J. might be seated in the front row to better focus her attention).[7]

R.J. continued to exhibit signs of depression, centered on her relationship with T. and home life. Around Christmas 2004, she was prescribed an anti-depressant. In early January 2005, Susan Silva (the school's learning specialist) sent an e-mail to R.J.'s teachers, informing them R.J. was taking "some new meds and her mom asked for feedback." The responses were mixed. One teacher said R.J. was "staying on task better." Another felt she seemed to have lost interest and require more encouragement to do class work. He also alluded to a "relationship" with a male student. Two other teachers responded that she seemed fine. A subsequent evaluation, in early February 2005, indicated the medication seemed to make R.J. drowsy, both in class and at home.

R.J.'s report card for August 30, 2004 through January 20, 2005, included five good grades and two D's. Both D's were from the same teacher, primarily because R.J. failed to turn in some assignments. R.J. earned an "A" or "A-" on 21 assignments or tests that she completed in those two classes. The teacher also noted that R.J. sometimes quietly read a book in class instead of listening to his lectures.

In late January 2005, R.J. visited the home of a school custodian, remaining there until 11:30 p.m. R.J. told Mother they were both in an Anime club and had spent the time talking. Mother complained to the District, which promptly reassigned the custodian to the night shift and admonished him to have no further contact with R.J.

On February 1, 2005, R.J. told her counselor that her parents were angry with her because of the incident. On February 5, 2005, a student observed that R.J. had one or more safety pins in her arm.[8] The

---

**7.** Mother contends she related numerous urgent matters to the IEP team during the meeting on December 8, 2004. The rest of the record does not support that recollection. Some of the events Mother cites likely postdated the IEP meeting.

**8.** The record contains a wide range of figures, from one pin to five pins to twenty-five pins to "well over 50."

school nurse examined R.J. Mother was notified. There may have been a second pin incident around the same time or perhaps later.[9]

Mother took R.J. to see the family doctor. R.J. confided various matters consistent with depression, family relationship issues, and some other things not uncommon in adolescent girls.

Several days later, R.J. met with Laurie Nielsen, a Psychiatric Mental Health Nurse Practitioner. Nielsen concluded R.J. was depressed over her relationship with T. and family changes such as Parents' divorce and Father's new partner. Nielsen made a provisional diagnosis of Adjustment Disorder "with a possibility of a Major Depressive Disorder." Mother contends Nielsen diagnosed R.J. with Attention Deficit Disorder, but it was only a "by history" notation.

Two days after R.J.'s first meeting with Nielsen, and before Nielsen completed her evaluation, Mother wrote to the District:

I would like to formally request a new IEP evaluation for [R.J.] based on her recent diagnosis. My understanding is that she should now qualify for EI[10] placement as well as her current placement. I know Federal guidelines require schools to provide any services needed to ensure her academic success and would like to address these issues during the evaluation.

Shortly afterwards, Mother advised the District that Nielsen was conducting an evaluation of R.J. and would furnish the District with a report. The District did not receive a written report,[11] but Nielsen did confer with the counselor at R.J.'s school. Mother also communicated information directly to the District. There is no reason to believe matters would have proceeded differently if the parties had received a written report sooner.

Parents decided to temporarily school R.J. at home. The District supplied a tutor who came to R.J.'s home. Under the constant supervision of Mother (a former teacher)—aided by the District tutor—R.J. completed some missing assignments and generally stayed current on her schoolwork. After a few weeks, Mother advised the District that R.J. was ready to return to school part-time. "Hopefully she will continue to stay on the right path and finish out the school year. If she reverts back she will be pulled out of school and other arrangement will have to be made for her schooling." R.J.'s teachers were apprised of the situation, asked to furnish weekly progress reports, and told to intervene immediately if they observed certain conduct.

The quarterly treatment review by her counselors at school assessed R.J. as having an adjustment disorder with mixed disturbance of emotions and conduct. Parent's divorce and Father's new relationship were noted as contributing factors. The counselor also observed that R.J. was easily influenced by peers, immature, and often acted impulsively. "Parents are attempting to provide appropriate supervision for their daughter however [she] often finds ways of evading this supervision." The treatment team decided to increase the frequency of counseling sessions to every week and to encourage R.J. to participate in activities such as sports and dance.

9. Mother had difficulty recalling the precise order of events and sometimes gave inconsistent dates.

10. This likely is an abbreviation for "emotionally impaired."

11. Nielsen may not have prepared a formal written report until one was requested for use in connection with the IDEA litigation. Tr. 705–06.

On March 28, 2005, R.J. returned to school full time. Her report card for January 25 to March 31, 2005, included a mixture of B's and C's, and a notation that she was still missing some assignments. Her final grades for the semester included three failing grades (two from the same teacher), premised largely on her failure to turn in assignments or, in one class, to take the final examination. When R.J. actually did complete an assignment or take an exam, she usually earned A's or B's.

By now, the District had implemented PowerSchool, which allowed parents to go online and see what assignments the student had completed (or not completed), the grade received, and the student's overall grade for the class. Mother says she regularly checked on PowerSchool, and saw what appeared to be incomplete assignments but that R.J. insisted the information was inaccurate.[12] The District responds that its records show Mother accessed the site only once that semester.

Regardless, R.J. failed three classes and had to attend summer school. Two days before summer school ended, Mother received a call from the teacher, stating that R.J. had not completed assignments and was in danger of failing. Mother says she confronted R.J., and told her to do what you need to do to pass, because "I'm not paying for another class, something that you got free. This is ridiculous." "She went in and within two days she did all the makeup assignments and passed the class."

Around July 2005, Parents warned R.J. that unless she followed their rules and kept her grades up, "you leave us with the choice of putting you into a residential facility or juvenile detention."

Father remarried in September 2005. His new wife ("Stepmother") and R.J. did not get along, which further strained relations between R.J. and Father. R.J. told a counselor she was "frightened when Stepmother drinks excessively and gets loud and angry" and that she felt unsafe around her. Stepmother also brought her own son to the relationship. This was a significant change for R.J., who resided at Father's home every other week.

R.J. did feel her relationship with Mother had improved. Her relationships with the opposite sex were another matter. R.J. was seeing T. again, and there were strong indications that it was an unhealthy and possibly abusive relationship. R.J. discussed some concerns with her counselor, and sought advice on how to address the issue. Unfortunately, knowing what she should do is different from actually doing it.

R.J. also had resumed contact with the school custodian, though the details are disputed. When Mother found out, she informed the District. The custodian was immediately terminated.[13] R.J. told her counselor Mother "fears that as soon as [R.J.] is 18 she will seek him out once again." The record also mentions other high-school age boys with whom R.J. associated at various times that year.

For the Fall 2005 semester, when R.J. was in tenth grade, Mother registered to receive weekly emails from PowerSchool showing the status of each assignment and grade for each project and class. Mother also received frequent reports from teachers and from Susan Silva, regarding R.J.'s academic progress and any other matters. Mother contacted the teachers and Silva whenever Mother had any concerns or

---

12. There may have been some initial difficulty getting all teachers to timely enter data.

13. In her testimony, Mother expressed considerable anger that the District "asked him to resign" instead of firing him. The distinction is not germane to this litigation.

questions. In an effort to prevent R.J. from remaining in contact with the former custodian, Mother asked the school to deny R.J. access to the internet.

In late September 2005, the English teacher informed Mother that R.J. had written a disturbing essay. Teachers also notified Mother when R.J. failed to turn in assignments, attempted to access the internet at school, or if they had other concerns.

Around September 30, 2005, Mother advised Susan Silva she was considering transferring R.J. to a "more restrictive program." The regular IEP annual meeting was not due until December, but the District and Mother agreed to advance the meeting to October 11, 2005.

R.J. and Mother first met with the counselor at school. R.J. reported she had been feeling very well lately. On a depression scale of 1 to 10, she rated herself a minus 5. She stated she had a new boyfriend who treated her well, she was doing better in school, developing better friends, and had a close relationship with Mother. However, the counselor noted, Mother was "very worried" about R.J.'s impulsive behavior and inability to see possible consequences. Mother feared "what might happen if [R.J.] went off her meds and was living alone." Counseling records show that, as of October 2005, R.J. was still receiving medication for ADHD and depression.

Later that day, Mother and R.J. attended the IEP meeting.[14] Also present were Vice–Principal Don Valentini; the District's Director of Special Education, Samuel Bogdanove; Special Education Teacher Susan Silva; and two of R.J.'s other teachers.

The feedback from the teachers was generally favorable. They enjoyed having R.J. in class. She had many positive attributes, was always polite and never a disciplinary problem. Her English teacher reported R.J. was still failing to complete some assignments,[15] and sometimes read in class instead of listening to the lecture. R.J. also had been caught attempting to access the internet at school, which she was forbidden to do. R.J. could still earn a good grade in the class by turning in the missing assignments. She had received good grades on all completed work.

The American Studies teacher reported R.J. was currently earning a "solid 'B' " in that class, had completed 13 of 14 assignments, and participated well in his class. Many of his assignments were required to be completed in-class, which might explain the higher completion rate. He had a detailed written schedule for the entire course, so students (and parents) would know precisely what was expected. He had reprimanded R.J. once for reading in class, and it had not recurred. He, too, had caught her trying to access the internet.

According to the PowerSchool report, R.J. also was earning an "A" in her Food

---

14. The District witnesses later testified they did not know Mother was recording the meeting, and had not observed a visible recording device. *Cf.* ORS 165.540(1)(c) (with limited exceptions, illegal to record in-person conversations without knowledge of all participants). Mother insists the recording was made openly and with permission from those in attendance. Though the parties devoted considerable time to this issue at the ALJ hearing, I consider it a collateral matter best put to rest.

The District may establish appropriate ground rules and procedures regarding this subject for any future IEP meetings.

15. R.J. insisted she had turned the assignments in. The teacher checked, but found no trace of it. This was by no means the first time that R.J. had claimed to have turned in homework, when in all likelihood she had not. Mother understandably was very concerned by such behavior.

& Nutrition class, an "A-" in Fiber Arts, a "C" in math (apparently for missing assignments), and a "C-" in science. Mother then raised her own concerns.

> Above and beyond her academics ... I think that R.J. is dealing with some severe emotional issues ... that stem from many things. Being adopted, divorce.... I just think that there are some serious emotional issues that are going on here that are affecting her interaction with peers and her interaction with parents and her interaction with teachers. Going behind people's backs, not being trustworthy. Lying about things that are supposed to be done and not done or whatever. And she does this across the board—it's not just at home. You know, she lies about things that have happened to her and gets kids in trouble. I mean there are just some things really deep-seated. And when I talked with Samuel and ... with you Susan what I am really looking for is some resources. I need some resources. She needs some help and one of the ways I know that we might be able to do this is as far as her IEP and all of this is, is she emotionally impaired and can we get services that would help her with that emotional impairment because she's a lovely young lady and has some wonderful qualities. And I really am worried about her. She's expressed some really risky, risky behaviors. Extremely risky behaviors including the custodian. There's a lot of things at play here. And, this is really hard for me to even bring up, but she needs some help, and I have done absolutely everything that I can possibly think of and I want her to be okay. And we adopted her because we didn't want her to get in to the same cycle that her biological mother was in.... [H]er biological mother at this point is living in a pickup truck. It's—it's just a mess. And, you know, we're trying to stop this and we don't know with the risky behaviors that she's been showing, um, we need to do something. And we as a whole need to do something.

> \* \* \*

> R.J. needs a very structured environment in order to function well. Very structured. I mean it. And she needs to be held accountable for her actions. And, you know, academically, emotionally, I mean there is such a large thing going on here. Peer interaction, being able to work in a group effectively. I know R.J. means to do well, I know she does. And I know in her heart she wants to do well. But I also know that when she is faced with that decision, that ultimate decision of am I going to go this way or am I going to go this way it's an impulsivity thing and she's going to go this way and then pay the consequence. \* \* \* [16]

Mother agreed that, for the most part, the problem was not "in class time" but "out of class time," such as lunch breaks or after school. R.J. described what (according to R.J.) she usually did during lunch, where, and with who. R.J. also insisted her interaction with the former custodian was only as a friend, and was now over. She denied engaging in other "risk taking behaviors" at school. Mother hinted there was more, but it was agreed that this should be discussed later with fewer people present.

R.J. acknowledged she was not allowed to access the internet, and agreed not to do so. The group discussed the limited

---

16. However, Mother acknowledged R.J. did not use drugs or alcohol, and Mother was "very proud of you for" that.

conditions under which R.J. was allowed to use a computer, the frequency of her counseling sessions, some structured after-school activities she could participate in, her career interests and post-high school plans, and her progress maintaining an up-to-date agenda of tasks. Mother expressed concern that R.J. might not be totally honest with her counselor.

Bogdanove, the District's Director of Special Education, questioned whether R.J. met the criteria for "emotionally disturbed."

> [I]t's something the team could look at, but that's not what I'm really hearing in the case of R.J. That doesn't necessarily ... impact what kind of services she is eligible for or isn't eligible for though.... [Kids] can be on IEP's for a lot of different reasons. In your case it's because you have a health impairment which is ADHD.... And so one of the things your Mom is worried about is that she sees you making some choices that maybe aren't in your best interest. She's wondering if it's really emotional issues that she wants you to have some help with.

Bogdanove explained that, from the IDEA perspective, "Typically when you look at that it's those emotional issues that play themselves out at school that the school would be concerned with. What I was hearing today didn't really show me a lot of that in terms of what's happening academically in class."[17]

After the two teachers left the room, the smaller group discussed R.J.'s relationship with T., Mother's suspicion that she was still associating with the former custodian, and that R.J. had recently "snuck out of the house...." R.J. assured them she was no longer in contact with the former custodian, and that T. was no longer abusing her. Vice–Principal Valenti urged R.J. to tell him if T. or anyone else at school mistreated her. "We don't play games with that kind of stuff around here."

Bogdanove pointed out that most of the incidents mentioned by Mother occurred "at night and on the weekends" rather than at school. He suggested family counseling and mentioned classes and other community resources for parents. Several were discussed.

Bogdanove also stressed the importance of setting limits at home. Mother responded that she had set limits, and R.J. knew the consequences if she violated them, yet she did it anyway.

> It just doesn't seem to have an affect. And so what I'm asking for ... R.J. needs some behavioral modification therapy.... Something where I think to know that all of her actions, you know, there are consequences, good and bad. And it's beyond my scope as a parent at this point in time because she is defiant. And not openly defiant as in, you know, yelling, screaming, openly defiant type attitude but still she is just going to go and do whatever it is that she is going to do. And all of this has to do with her attention deficit. It's like, you know, like I said, deep-seated emotional issues. There is just a whole lot of things at play here. And I need help for her. And I want help for her.

Bogdanove responded, "I would love to tell you that there's a silver bullet. I would be lying to you if I did." He again mentioned "looking at resources that are available to you in the community." "In terms of school [however] by-and-large school is successful. So where things are happening is this relationship [with her family] at home."

---

17. Some of the discussion that followed is missing, apparently because the tape ran out. The duration of the interval between tapes is unclear.

Since impulsive decision making was a concern, Susan Silva suggested R.J. carry a cell phone and call Mother regularly. Mother replied that she no longer permitted R.J. to have a cell phone. Vice–Principal Valenti suggested a behavior contract. Mother responded, "We've done it. We have it written out. We have all the consequences. We have all the rules." R.J. acknowledged, "I try to make it work but sometimes I just—I want to do what I want to do. And that's what gets me in trouble."

Mother warned that if R.J. persisted in talking to the former custodian, or being "out with people she not supposed to be out with," Mother might "put her in a residential facility...." Bogdanove noted there is "something of an alternative school" nearby which was highly structured but would also mean interacting with "a lot of kids who need that kind of structure" which wasn't necessarily a good idea. However, "if it comes to a point where things aren't moving in the right direction" it is something "that we could consider."

Mother was not satisfied:

Mother: I honestly believe that she is emotionally impaired.[18] I honestly believe that. I'm not sure what that means and the guidelines of the school system. I can not stand by and keep watching her do this to herself, without knowing that I have taken every step ...

Bogdanove: Emotionally impaired because she's making some bad choices?

Mother: Yeah.... [A]nd even the school part of it is a continual on her, make sure it's done, check on her. Even there if she's left to her own devices, she's not going to do the schoolwork unless somebody is absolutely....

The group discussed some steps the school would take, such as allowing R.J. access to a computer only with direct supervision by the Learning Center staff, reminding all staff of the ban on internet access, and not permitting R.J. to read books in class during lectures. Mother already was receiving weekly PowerSchool updates, and e-mails from teachers, and teachers would contact her promptly if R.J. was missing assignments or other problems arose.

Bogdanove told Mother the District could consider having school psychologist Walton conduct a further evaluation of R.J.

To be very frank my only concern about this is its not uncommon behaviors for a sophomore with adjustment issues to experience. And that doesn't mean that they are not very difficult behaviors or that they aren't concerns here, but I don't know that in terms of decision making that I'm hearing from R.J., I don't know how much of that is impulsivity and how much of it is I just want to do this because it's cool.... I think that if we would kind of put your mind at ease or maybe open up some things that we haven't looked at, we would have the school psychologist do some work....

Mother responded that R.J. already "had a psych evaluation." Bogdanove and Silva asked Mother for a copy of it.

After the IEP meeting, R.J.'s English teacher searched for, but did not find, the assignments R.J. had claimed she turned in. The teacher suggested having R.J. redo the assignment, but Mother instruct-

---

18. R.J. appears to have been hurt by Mother's repeated references to R.J. as "emotionally impaired" and announcement that R.J. would be "put ... in a residential facility" if she continued to see friends who Mother disapproved. Two days after the meeting, R.J. secretly posted a MySpace entry describing herself as "emotionally impared" (sic) and expressing suicidal feelings.

ed the teacher to give R.J. "zeros for that work." The teacher did. R.J.'s progress report for Sept. 6 through Nov. 7, 2005, included very good grades in some classes, respectable grades in several others, but poor grades in English and Science.

Around Thanksgiving 2005,[19] Mother concluded that R.J. was still sneaking out of the house. R.J. was banished from Mother's home and sent to reside with Father and Stepmother, with whom R.J. had a strained relationship.

R.J.'s teachers observed a "definite shift" in her behavior after Thanksgiving 2005. She was late for classes, and arrived at school without a coat on a cold day. She participated less in class discussions, seemed preoccupied, and was observed writing extensively in her journal, which she tended to do when she was feeling very emotional. She was upset about being banished from Mother's house, and she told a teacher that "her mom was thinking about 'sending her away'" to a facility in Central Oregon. This would be distressing for most children, but especially for an adopted child.

R.J.'s suspicions were well-founded. Over Thanksgiving weekend, Mother had formally notified the District that she was removing R.J. from school effective December 12, 2005, and enrolling her in a private behavioral modification residential facility in Central Oregon.[20] Mother demanded that the District pay all fees charged by the company operating the facility. Mother also served the District with what amounted to a discovery request, and asked that the documents be furnished to a specific attorney (who specializes in IDEA litigation).

On December 7, 2005,[21] Bogdanove responded that R.J. was currently earning "A's" in two classes, and a "B" in a third class. The low grades in her other classes were attributable to assignments not turned in. She had received good grades on most completed assignments. R.J. could still complete the missing assignments before the end of the semester, and pass the classes. Bogdanove's letter also responded to several allegations Mother had made. Bogdanove proposed to convene another IEP meeting on December 9, 2005, to discuss Mother's concerns.

Parents' attorney advised the District they would not attend. Mother has provided various explanations, but it is clear that Parents simply saw no point in attending. Mother had already decided to withdraw R.J. from school and signed a contract with the Central Oregon facility. This was not intended as a temporary change. In the application, Mother indicated that R.J. might well remain at the Central Oregon facility until she turned 18.

The IEP meeting proceeded without Parents. The IEP group discussed the changes in R.J.'s behavior since Thanksgiving, and the allegations Mother made in her letter to the District. The group agreed that, based on the information they had, R.J. did not require "residential placement." "[O]verall, R.J. was successful in her present placement and did not need a special class or special school to address issues of work completion, tardiness or trustworthy behavior." The District proposed to obtain a further psychological evaluation and functional behavioral assessment, and then decide whether additional changes were warranted based on

---

**19.** Mother's account of certain events during the hearing was internally inconsistent.

**20.** That date was the minimum notice necessary to comply with 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb) (which authorizes

denial or reduction of reimbursement for expenses parents incur for private school placement if advance notice was not provided).

**21.** The letter is misdated November 25, 2005.

the results and upon R.J.'s grades the remainder of the semester. Her counselor also felt that family counseling (in addition to the individual counseling for R.J.) would be beneficial.

For now, the IEP would be modified to have R.J. work in the Learning Center with Susan Silva daily. Additional time would be devoted to organizational and social skills, with the status of each assignment closely monitored. Since R.J. had begun arriving late to some classes, a peer mentor (or school employee) would be assigned to travel with her from class to class. Her attendance would be reviewed twice a day. There would be punishments for unexcused tardies or missed assignments, and rewards for weeks with no unexcused tardies and missed assignments. The school would continue to send weekly progress reports to Parents. R.J.'s computer access would remain severely restricted, with no access to the internet.

Mother did not accompany R.J. to the Central Oregon facility, but instead paid a "transport service" to "escort" R.J. there. The Central Oregon facility is part of a nationwide chain of for-profit facilities targeting students who have "demonstrated oppositional behavior."

In the application materials, Mother listed numerous concerns that prompted her to send R.J. to the Central Oregon Facility. It would take several pages to list all, but grades at school was not a principal reason. Nor is education the primary objective of the Central Oregon facility. An employee, who testified for Parents, characterized it as "an emotional growth boarding school." Movement within the facility is restricted. Residents are limited to a single phone call a week, while a staff member listens in on the call. Family visits are infrequent, and sometimes withheld if the resident fails to comply with rules or complete assignments.[22]

R.J. was evaluated while at the Central Oregon facility. During interview and tests performed for that report, her attention and concentration "were considered average. No unusual behaviors were noted, other than her tendency to be very open and forthright in her responses during the interview." "According to test results she is achieving in all academic areas commensurate with her intellectual ability. No learning disabilities are suspected."

The Central Oregon facility did not prepare an IEP for R.J. until six months after she arrived. This new IEP contained fancier language than the District IEPs, but fancier language did not translate into better results. Progress reports regularly showed R.J. failing nearly all her classes, not because she was incapable of doing the work but because the staff kept removing R.J. from class and sending her to "self-study" as punishment for rules violations unrelated to classwork. "Self-study" included coerced self-criticism, mandatory "journaling," and heavy physical labor coupled with painting "positive, uplifting, inspirational statements" on rocks.

R.J. missed so many classes that she was left back (or, to use the facility's terminology, she "dropped a peer group"). R.J. initially cooperated in hopes of pleasing her parents and being sent home sooner, but grew increasingly unhappy as her

---

22. Residents also are required to confess past alleged transgressions, and to keep doing so until the resident produces a written confession satisfactory to the parents and staff. Any hope of leaving the facility soon, or even gaining small privileges, is tied to producing a satisfactory confession. The reliability of a document procured in such manner is highly suspect. R.J.'s tale grew more lurid and detailed with each telling. Although Mother relies on it extensively in her brief, I give little weight to that confession. The credibility is suspect and the contents are not particularly relevant.

confinement continued. Constantly being around "troubled" teens did not help either. Some family visits were withheld on the basis that she had not "earned" them.[23]

R.J. vowed to "do anything to get kicked out" of the Central Oregon facility. She began claiming to see visions and hear voices, kicked a hole in a wall, slapped one student and made threats toward others. She hid in places where the staff could not find her.

R.J. was looking forward to a scheduled visit from Mother and one or both sisters. Mother canceled the visit because R.J. failed to complete some school assignments. Shortly afterwards, R.J. was "caught"[24] in a sexual encounter with another resident, and expelled from the Central Oregon facility.

An "Exit Summary" tells the story of her stay at the Central Oregon facility:

"Presenting issues at time of enrollment: . . . . [D]epression, anxiety, feeling of abandonment with adoption, and severe inappropriate sexual behavior. * * * *"

"Issues at time of discharge and progress: R.J. left . . . with very similar behaviors as she enrolled."

At the IDEA due process hearing conducted by the ALJ, a staff member from the Central Oregon facility testified that R.J. "tends to work really well sometimes and not so well at other times, and a lot of the time it was if she was interested in something and was interested . . . in the class, she participated well." "[S]he's so quiet that you would think that she would be doing what she was expected to do and then you look and she's reading her book. . . ." This was not news to R.J.'s teachers at the Ashland School District.

R.J. was under the impression that, if expelled from the Central Oregon facility, she would be sent home. Instead, she was "escorted" to a more restrictive private behavioral modification facility in Arizona owned by the same for-profit company.

Angry over this turn of events, R.J. appears to have deliberately sabotaged the psychological testing conducted at the Arizona facility, endorsing nearly every symptom listed. She scored "severe" on scales for Bulimia; Panic Disorder; Social Phobia; Separation Anxiety Disorder; Major Depression; Dysthmic Disorder; Schizophrenia; Avoidant Personality Disorder; Borderline Personality Disorder; Schizotypal Personality Disorder; Disorientation; Introversion; Self–Concept; Alienation–Boredom; Anger; Interpersonal Problems; Emotional Lability; Suicide; and others.

Certain psychiatric disorders can first become evident around this age, but there is no credible evidence in this record to support such diagnoses. The person analyzing the test for the Arizona facility acknowledged strong indications that the test results were "invalid."

The record contains very little information regarding events after R.J. was sent to the Arizona facility. The record does reflect efforts by employees of the Arizona facility—working in conjunction with Mother's attorney—to portray R.J. as a "profoundly disturbed" child who cannot function outside of the Arizona facility. On cross-examination, it became apparent that those witnesses had not even reviewed R.J.'s public school records or any psychological evaluations conducted by persons not in the employ of (or deriving a substantial portion of their income from)

---

**23.** Mother and Sister did pay a surprise visit once, which R.J. greatly enjoyed. Father also visited her at least once. However, such visits were infrequent, and R.J. did not respond well to using family visits as a reward or punishment.

**24.** The staff believes she intended to be caught, so she would be expelled.

the company that operates the Arizona and Central Oregon facilities. After carefully reviewing their testimony, I do not find it persuasive.

The record does not demonstrate that R.J. has been notified that, by law, many rights under the IDEA transfer to the student when he or she reaches the age of majority. *See* 20 U.S.C. § 1415(m); ORS 343.181.[25] R.J. reached that age while this action was pending.

### Discussion

The IDEA was enacted "in response to Congress' perception that a majority of handicapped children in the United States were either totally excluded from schools or sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'" *Rowley,* 458 U.S. at 179, 102 S.Ct. 3034 (internal citation and punctuation omitted). The IDEA seeks "to ensure that all children with disabilities have available to them a free appropriate public education ... designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. § 1400(d)(1)(A).

■ The IDEA focuses more on "open[ing] the door of public education to handicapped children ... than ... guarantee[ing] any particular level of education once inside." *Rowley,* 458 U.S. at 192, 102 S.Ct. 3034. The statute provides federal funding to assist states in educating the disabled, but conditions such funding on compliance with specific goals and procedures. *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1469 (9th Cir.1993).

One such procedure is the formulation and implementation of an Individualized Education Program ("IEP"). Each disabled child must have an IEP, formulated by a team that includes the child's parents, teachers, district representatives, and other relevant personnel. 20 U.S.C. § 1414(d). The IEP must address the child's present level of academic achievement and functional performance and establish measurable annual goals. The IEP must also provide related services, defined as "transportation, and such developmental, corrective, and other supportive services ... as may be required to assist a child with a disability to benefit from special education" to be provided to the child. 20 U.S.C. § 1401(26).

The IDEA contemplates that children with disabilities ordinarily will be educated alongside children who are not disabled. Special classes, separate schooling, or other removal of disabled children should occur only when the nature and severity of the disability is such that education in a regular classroom environment cannot be satisfactorily achieved. 20 U.S.C. § 1412(a)(5)(A).

■ A State satisfies its obligation to provide a child with a "free appropriate public education"

> by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP. In addition, the IEP, and therefore the personalized instruc-

25. An exception exists for "a child with a disability who has reached the age of majority under State law, who has not been determined to be incompetent, but who is determined not to have the ability to provide informed consent with respect to the edu- cational program of the child...." 20 U.S.C. § 1415(m)(2). *See also* Or. Admin. Code 581–015–2325. Nothing, at least in this record, suggests the exception applies to R.J.

tion, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade. *Rowley*, 458 U.S. at 203–04, 102 S.Ct. 3034.

The ALJ concluded that the District failed to offer R.J. a free appropriate public education. I disagree.

### A. *2003 and 2004 IEPs*

Many alleged violations found by the ALJ concern what he perceived to be defects in earlier IEP's, including those from December 2003 and April 2004; the District's alleged failure to fully implement the 2003 and 2004 IEPs; and the District's alleged failure to convene an IEP meeting in February 2005.

These earlier IEPs, and the manner they were implemented, may be relevant to show what information the District had regarding R.J.'s needs, what efforts the District undertook to meet those needs, and how the student responded. *Cf. M.S. v. Fairfax County School Bd.*, 2007 WL 1378545 at *12 (E.D.Va.2007). The prior IEPs and their implementation may also be relevant in evaluating the adequacy of the current proposed IEP, deciding if it was reasonably calculated to meet R.J.'s educational needs, and perhaps even in evaluating whether the District was likely to honor commitments it made in the IEP.

The ALJ did not stop there, however. At the urging of Parents, the ALJ decided that defects in *past* IEPs constituted a denial of a free and appropriate public education which justified removing R.J. from the District several years later and placing her in a private facility. That was error.

■■■ The IDEA is not a tort remedy to compensate parents with money damages for past wrongs. Even assuming a 2003 or 2004 IEP was inadequate, those IEPs were superseded by the October 2005 and December 2005 IEPs. Defects in a superseded IEP do not ordinarily (if ever) justify removing the child from school several years later and requiring the District to pay for her future private schooling.[26]

Rather, the inquiry must focus on the child's IEP at the time she was removed from school, whether she was then receiving a free appropriate public education, and whether the appropriate placement is the one being proposed by the District, or the one proposed by Parents, or some other placement.

■■■ The ALJ relied upon ORS 343.165(3)(a). That statute does not authorize the ALJ to find violations of the IDEA—and to order the District to compensate Parents for a placement that did not exist until August 2006—based upon alleged deficiencies in the 2003 and 2004 IEPs. Those earlier IEPs were in effect for a limited term and were superseded before Parents ever disputed R.J.'s IEP or placement.[27] Allowing a parent belatedly to

---

**26.** The present litigation does not implicate the theory of "compensatory education" to remedy past deficiencies. *See Park v. Anaheim Union High School Dist.*, 464 F.3d 1025, 1033–34 (9th Cir.2006).

**27.** *S.V. v. Sherwood School Dist.*, 254 F.3d 877 (9th Cir.2001), an Oregon case, is distinguishable. In *S.V.*, the parents removed the child from public school in 1996, but waited until 1999 to seek reimbursement for private school tuition they paid from 1996 through 1998. The Ninth Circuit applied a two year limitations period. Whether Parents are entitled to reimbursement for expenses incurred during the two years before they requested a due process hearing, or whether Parents sought a hearing within two years after removing R.J. from public school, is not at issue in the present litigation.

seek reimbursement for a private residential placement in this manner amounts to an end-run around the requirement that parents must give advance notice that "they [a]re rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense[.]" 20 U.S.C. § 1412(a)(10)(C)(iii)(I). When no objection is made until after the IEP has already expired, the District is denied an opportunity to remedy the alleged defects.

 In any event, the alleged defects in the 2003 and 2004 IEPs did not impair the quality of the education provided to R.J. or her ability to benefit from that education. Adding fancier language to the IEP, or purporting to quantify R.J.'s behaviors to three decimal places, would have made no difference in her education. The purpose of the IDEA is to provide educational opportunities to children with disabilities, not merely to paper files.

The ALJ ruled that the "December 2003 and April 2004 IEPs contained legally insufficient PLEPs regarding social issues for R.J." The "PLEP" requirement, or Present Level of Educational Performance, is derived from 20 U.S.C. § 1414(d)(1)(A), which required an IEP to include:

(I) a statement of the child's present levels of academic achievement and functional performance, including—

(aa) how the child's disability affects the child's involvement and progress in the general education curriculum;

* * * *

The ALJ acknowledged the December 2003 and April 2004 IEPs contain such a discussion, but noted it was "almost identical" to the discussion of this topic in the December 2002 IEP. That does not seem unusual. These IEPs were for the same student and the same qualifying disability. Nor is there reason to believe that revising the wording of the PLEP would have affected R.J.'s education. R.J. is not a child who sat ignored in a dark corner of the schoolhouse for years. Mother and District personnel often informally discussed R.J.'s progress and any concerns, in addition to the formal IEP framework. R.J. also received regular one-on-one counseling paid for by the school. There were occasional bumps in the road, as is true of most students, but on the whole R.J. was doing well in school during that time period.

## B. Adequate Progress Reports in 2004–2005

 The ALJ ruled that the District violated "20 U.S.C. § 1414(d)(1)(A)(vii)"[28] by not "providing [Parents] with adequate progress reports between May 30, 2004 and July 5, 2005." At the time, this provision required IEPs to include a statement of:

(II) how the child's parents will be regularly informed (by such means as periodic report cards), at least as often as parents are informed of their non-disabled children's progress, of—

(aa) their child's progress toward the annual goals described in clause (ii); and

(bb) the extent to which that progress is sufficient to enable the child to achieve the goals by the end of the year.

During Summer 2004, R.J. was not attending school, so there was nothing to report. During part of Spring 2005, R.J. was tutored at home. Aside from that

---

28. The ALJ likely meant § 1414(d)(1)(A)(viii), amended and renumbered by P.L. 108–446 effective July 1, 2005, and now codified at 20 U.S.C. § 1414(d)(1)(A)(i)(III).

time, Parents received periodic report cards—at the same intervals as other parents—showing R.J.'s current grade and attendance record in each class, along with some brief but informative comments by her teachers.

If the report cards were the only contact between Parents and the school, the ALJ's critique might be better supported. However, by no later than Spring 2005, the District had implemented the PowerSchool web site, which enabled Parents to obtain more detailed information at frequent intervals. Mother admits knowing that, according to PowerSchool, R.J. had not turned in many assignments during Spring 2005. Mother says she accepted R.J.'s explanation that the PowerSchool records were wrong. Perhaps so, though Mother has also reported that failing to complete homework assignments, and then lying about it, was a longstanding problem for R.J. Given such history, Parents might also be expected to have noticed that assignments weren't being completed when they reviewed assignments with R.J. each evening in preparation for the next day's schooling.

The record also reflects frequent communications between Mother and school personnel regarding everything from missed homework assignments, to how R.J. was reacting to medication changes, to concerns about personal relationships or other matters. One reason Mother obtained a re-evaluation of R.J. in early December 2004 was because "Mother receives frequent phone calls from school regarding incompletion of school work." When R.J. nearly failed summer school because of missed assignments, a phone call from the school alerted Mother in time.

R.J. did fail one class in Spring 2005 after she inexplicably did not attend the final examination. It is unclear what reports the District could have given Mother to prevent that occurrence.

The ALJ's opinion appears to presume that a school must make each social and behavioral objective numerically quantifiable and then furnish numerical progress reports, for instance, "student demonstrates productive classroom behavior 32% of the time," or "student had an average of 3.2 positive social interactions each day." For many if not most teenage students, that degree of reporting is neither feasible nor desirable.

The IEP and the reports provided to Parents quantified that which is readily capable of being quantified, such as the number of hours per week a particular service would be provided, a description of the service, R.J.'s attendance record, and her grades. For some students, other goals might be quantified, such as "no suspensions for misconduct" or "no disruptions in class," but these were not issues with R.J. The IEP could have quantified a few items that it did not, such as "no missed homework assignments." However, there is no easy way to quantify goals such as having the right friends or making good decisions. At best, the school could measure the results (no arrests, or no unexcused absences).

The reports furnished to Parents by the District during the relevant time period, formally and informally, were adequate in light of the facts known to the District. If any deviation from the IEP did occur, it was not material. *Cf. Van Duyn v. Baker School Dist. 5J*, 502 F.3d 811, 815 (9th Cir.2007) ("[school] district does not violate the IDEA unless it is shown to have materially failed to implement the child's IEP").

## C. *Failure to Convene Special IEP Meeting in February 2005*

The ALJ faults the District for not convening "an IEP meeting in Febru-

ary 2005 to determine whether R.J. required additional services." The IEP had been re-evaluated just two months before. In preparation for the December 2004 IEP, R.J. had been evaluated by school psychologist Walton in November 2004, and Mother had obtained her own medical evaluation of R.J.

Following the pin incident in February 2005, Mother initially sought a re-evaluation by the school, but then advised the District she would obtain a private psychological evaluation instead and furnish the results to the District. That evaluation did not reveal anything significant that warranted modifying the IEP. The issues identified in that evaluation centered on home life and the breakup of a relationship, not educational problems. The District was advised that R.J. was receiving medication and counseling to address the issues identified.

In practice, some temporary revisions were made to the IEP. Mother chose to school R.J. at home for a while. The District provided a tutor, at District expense, who came to Mother's home. Mother decided when R.J. would return to school and under what conditions. At every step of the way, it was Mother—a former teacher well versed in IEPs and the IDEA—who was in charge. Had Mother wanted a formal IEP meeting convened, I have little doubt there would have been a formal IEP meeting. Instead, Mother and the District worked together informally to accomplish what needed to be done. R.J. returned to school and she appeared to be doing well. Under the circumstances, any alleged IDEA violation that resulted from not convening a formal IEP meeting in February 2005, or from not formally modifying the IEP, was harmless (and invited) error.

### D. *October and December 2005 IEPs*

 The principal reasons Mother withdrew R.J. from school in December 2005 had little to do with the quality of the education R.J. was receiving. Rather, Mother believed R.J. was sneaking out of the house to carry on a relationship of some sort with a 28–year old man who was formerly a custodian at the school, and perhaps with one or more teenage boys. Mother also perceived R.J. as "defiant" and did not approve of her friends. In addition, R.J. was upset over personal issues such as Parents' divorce. R.J.'s academic performance was affected by such matters only in the sense that she sometimes was distracted by these outside issues, as were her parents (who, being preoccupied with other matters, may in hindsight not have monitored her schoolwork closely enough).

Children experience many issues in life. Public schools are not responsible for all. If a child is disobeying her parents, or engaging in sexual conduct after school hours, a public school is not automatically responsible for solving those problems.

The primary task of a public school is to educate the child. Pursuant to the IDEA, this includes children with disabilities.

The IDEA does require schools to provide certain incidental services necessary for the child to attend and benefit from school. *See, e.g., Irving Independent School Dist. v. Tatro,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984) (occasionally inserting catheter during school day, so child could urinate, which task could be performed in minutes by trained lay person, was "supportive service" necessary to benefit from special education services)

In providing an education, the school must also consider basic social functioning, sufficient to permit the child to participate

in a group setting such as a class. R.J. was not disruptive in class. She was well regarded by her teachers, able to learn in regular classes, and capable of benefitting from the education provided to her by the school. It was mostly her behavior away from school that was at issue.

With perhaps a few very narrow exceptions [29] not applicable here, the IDEA does not make a public school district responsible for regulating the sex lives of students, especially students attending regular school classes (as R.J. was). There are laws covering matters such as sexual harassment and statutory rape. The IDEA is not such a law.

■ That students are engaging in sexual conduct outside school, or are less interested in school because they are distracted by intimate relationships, is largely beyond the scope of this statute. The IDEA does not require schools to remove every impediment to learning of any kind and from any cause. If a student is stealing cars, the IDEA would not require the District to post bail and hire a lawyer to represent him, even if a prison term would interfere with his education and stealing cars allegedly is a symptom of his disability. "[I]n enacting the IDEA, Congress did not intend to create a federal claim for every activity or type of conduct which may impede an individual's ability to take advantage of the educational opportunities." *Armstrong ex rel. Steffensen v. Alicante School*, 44 F.Supp.2d 1087, 1089 (E.D.Cal.1999).

Mother argues, and the ALJ accepted, that acting without fully considering the consequences, and engaging in risky be-

havior even after being told of the consequences, is part of R.J.'s "disability" and that this makes the school responsible. Using that criteria, a substantial part of the teenage population of America suffers from the same "disability."

Mother essentially wanted R.J. confined to a facility far from home, cut off from contact with these boys and under constant supervision so R.J. did not have sex or access the internet. Mother also wanted R.J. to receive behavior modification therapy. Mother also perceived R.J. as "defiant," believed that she lied, and Mother did not approve of R.J.'s friends. This may all properly be of great concern to a parent, but it is not a disability for purposes of the IDEA.

> Pursuant to 34 C.F.R. § 300.104,
>
> If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child.

The record does not show that placement in a residential facility was necessary to meet R.J.'s *educational* needs. Rather, her placement stemmed from issues apart from the learning process, which manifested themselves away from school grounds.[30]

Moreover, the limited information the court has on the Arizona facility suggests that education is a relatively minor component of that program. Students are not sent there merely because of learning difficulties, nor are academic deficiencies a requirement for admission. It is primarily a

---

**29.** For instance, it might be necessary to explain to a child that certain behaviors are not appropriate in a class setting.

**30.** I do not accept the District's contention that failing one or two classes is typical for a high school freshman, and nothing to be con-

cerned about. It is definitely a concern. However, R.J. was not failing classes because of any academic problems, but because of problems in her life outside school. From all indications, R.J. could easily earn passing grades when she was paying attention to school.

behavioral modification facility for children perceived as defiant or otherwise acting out at home.[31]

The IDEA also requires that, to the maximum extent appropriate, students with disabilities be educated in the regular classroom or school, not segregated in special classes or schools for students with disabilities. The entire population of the Arizona facility is comprised of teenage girls perceived to have significant behavioral problems requiring intensive treatment. The record does not show that R.J. required such a program for any educational reason. *Cf. Clovis Unified Sch. Dist. v. California Office of Administrative Hearings,* 903 F.2d 635, 643 (9th Cir. 1990) ("our analysis must focus on whether Michelle's placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process"); *Hall v. Freeman,* 700 F.Supp. 1106, 1115–1116 (N.D.Ga.1987) ("The court believes that Andrew's problems are segregable from the learning process and that there is nothing intrinsic in Andrew's condition that would necessitate residential placement in order for him to learn"); *Clay T. v. Walton County School Dist.,* 952 F.Supp. 817 (M.D.Ga.1997); *Swift v. Rapides Parish Public School System,* 812 F.Supp. 666 (W.D.La.1993) (even if a child might benefit more from residential placement, the school district is not required to pay for that service if the child could receive an adequate, if not as good, education at a regular school); *N.C. ex rel. M.C. v. Bedford Cent. School Dist.,* 473 F.Supp.2d 532 (S.D.N.Y.2007) (behavior and problems in school, were mostly due to drug use, sexual conduct, and other issues, not a learning disability or handicap); *Austin Independent School Dist. v. Robert M.,* 168 F.Supp.2d 635, 640 (W.D.Texas 2001) (schools are not required to force or motivate students to take advantage of the education they offer—this is the parents' role), *affirmed,* 54 Fed.Appx. 413 (5th Cir. 2002); *Springer v. Fairfax County School Bd.,* 134 F.3d 659, 661, 664 (4th Cir.1998) (declining to require school district to pay for residential placement when the student's poor grades resulted from lack of motivation, truancy, and a refusal to study. "[I]t is not intended to be the duty of special education to *force* socially maladjusted children to school by residentially placing them if they choose to remain truant." *Id.* (quoting *In re Corpus Christi,* 18 IDELR 1281, 1283 (SEA, Tex. 1992)) (emphasis in original)). *But cf. Independent School Dist. No. 284 v. A.C.,* 258 F.3d 769, 775–78 (8th Cir.2001) (acknowledging student had no learning disabilities, but reasoning that truancy and failure to comply with other school requirements were a symptom of a disability, and she would not attend school unless forced to do so by placing her in a residential facility).

Mother relies on *Seattle School Dist.,* 82 F.3d 1493, but it is distinguishable. In *Seattle,* the child was very disruptive in class, verbally and physically assaultive, and eventually had to be expelled from school and hospitalized. She was unable to participate in a regular school environment. The school district was unable to

---

31. Some Ninth Circuit cases appear, at first glance, to place great emphasis on whether a facility offers state-accredited classes. *Cf. Seattle School Dist.,* 82 F.3d at 1502; *Taylor v. Honig,* 910 F.2d 627, 632 (9th Cir.1990), *affirmed,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). However, many prisons and juvenile detention facilities offer state-accredited classes and inmates may even earn degrees, yet the primary reason for a person being there is not educational, nor is it (for IDEA purposes, at least) the only environment the person can be educated in. State accreditation may be a factor to consider, but it is not dispositive.

cope with the child and provided her with few services. The IEP team did not include anyone knowledgeable about her disorder. The experts recommended placement in a residential facility. The ALJ and the district court both agreed. Moreover, by the time of trial, she had already spent seven months at the facility. The court heard testimony that she was doing well there and would sustain harm if belatedly removed from that facility. Those are not the facts here.

*County of San Diego v. California Special Ed. Hearing Office*, 93 F.3d 1458 (9th Cir.1996), also is distinguishable assuming, *arguendo*, it was correctly decided. The child in *San Diego* had a long history of serious educational and emotional problems, and had been classified as "seriously emotionally disturbed." *Id.* at 1462, 1468. She was hospitalized following "violent outbursts related to preparing a school science report. [Her] frustration with the assignment led her physically to abuse her mother and to break windows...." *Id.* at 1462. She "was assigned little or no homework because it was regarded as too stressful for her." *Id.* at 1463. At the recommendation of County Mental Health, she was placed in a day treatment program. She sometimes refused to attend school. *Id.* She had more violent outbursts related to writing assignments, attacking her mother and sister and threatening to burn the house down, for which she was again hospitalized. *Id.* The hospital recommended she not return home. *Id.* Her mother then placed her in a residential facility. The Ninth Circuit noted that options less restrictive than residential placement, such as day treatment, had already been tried and had failed. *Id.* at 1468. The panel further found that the child's "primary problems are educationally related." *Id.* It also is noteworthy that, under California law, the County welfare department (and not the school district) was responsible for the cost of the child's residential treatment program. *Id.* at 1462.

These are very hard cases. When a child encounters serious problems in life, as R.J. did, parents naturally want to do everything they can for the child. The cost of treatment can pose a great hardship or be prohibitive for many parents. While the court is sympathetic to those concerns, the IDEA does not cover every problem a child may have in life. The statute is far narrower than that.

### Conclusion

The decision of the Administrative Law Judge in favor of Parents is reversed.

IT IS SO ORDERED.